WILLIAM E. WESTBROOK

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield September 27, 1888.*

1. DYING DECLARATIONS—*preliminary question for the court—and herein, what will constitute dying declarations.* It is for the court to determine upon the admissibility of the declarations of a party before his death, upon proof of the condition of his mind at the time they were made; and if the proof does not satisfy the court, beyond a reasonable doubt, that such declarations were made in extremity, and that they were dying declarations, they should not be permitted to go to the jury.

2. The question as to the belief of a person whose statements or declarations are sought to be introduced as dying declarations, that his death was then impending, must be determined from facts proved, and not by the mere opinions of witnesses. No weight can be given to the

6—126 ILL.

testimony of a witness giving it as his opinion that a wounded person, at the time of making a statement of the facts of the case, believed he was about to die, without giving any facts upon which such opinion is based.

3. Dying declarations are such as are made by the party relating to the facts of the injury of which he afterward dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance, and in the absence of all hope of avoidance,—when he has despaired of life, and looks to death as at hand.

4. That one making a statement of this kind was in extremity, may be proved either by language used or acts performed, and it may be inferred from the evident danger of the party, or from statements made to him by medical or other attendants; but by some mode of proof it must affirmatively appear that all hope of recovery was gone.

5. EVIDENCE—*threatening letter, by one who afterwards killed the person for whom the letter was intended.* A party tried for a homicide, a few days before the killing wrote a letter, directed to the brother of the deceased, (the two latter being partners in the business of selling liquors under a license,) threatening to prosecute them for selling liquor to minors unless $25 was paid him. The proof showed that the letter was intended for both the deceased and his brother, and the accused admitted that he had sent the letter: *Held,* that such letter was properly admitted in evidence on the trial.

WRIT OF ERROR to the Circuit Court of Macon county; the Hon. C. B. SMITH, Judge, presiding.

Messrs. MILLS BROS., and Mr. I. D. WALKER, for the plaintiff in error:

The court erred in admitting the letter written by the defendant to Charles Gross to be read in evidence.

The court erred in admitting the statements of the deceased as dying declarations. *Starkey* v. *People,* 17 Ill. 17; *Tracy* v. *People,* 97 id. 101; *Digby* v. *People,* 113 id. 123; *Warner* v. *State,* 35 Am. Rep. 745; *Dunn* v. *State,* id. 60; *Lewis* v. *State,* 9 S. & M. 120; *Bull* v. *Commonwealth,* 14 Gratt. 620; *Jackson* v. *Commonwealth,* 19 id. 668; *Commonwealth* v. *Roberts,* 108 Mass. 296; *Morgan* v. *State,* 31 Ind. 193; *State* v. *Simion,* 50 Mo. 370; Greenleaf on Evidence, secs. 156, 158.

Mr. GEORGE HUNT, Attorney General, for the People :

It is the belief of a declarant that his wound is mortal, and that his account with time is to be speedily closed, that renders the declaration admissible.    It matters not how this belief is manifested,—whether by word or conduct, or by an accurate perception of his true situation,—yet its existence must be shown in some way.    *Lewis* v. *State,* 9 S. & M. 115 ; *Nelm* v. *State,* 13 id. 500 ; *State* v. *Nash,* 7 Iowa, 347 ; *Commonwealth* v. *Roberts,* 108 Mass. 296 ; *Starkey* v. *People,* 17 Ill. 21 ; *Murphy* v. *People,* 37 id. 447.

It is essential that the dying declaration be made under a sense of impending death ; but it is not necessary that they should be stated, at the time, to be so made.    It is enough if it satisfactorily appears, in any mode, that they were made under that sanction,—whether it be distinctly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct, or other circumstances of the case—all of which are resorted to, in order to ascertain the state of the declarant's mind.    1 Greenleaf on Evidence, sec. 158 ; Wharton on Crim. Ev. secs. 281, 282.

The length of time between the declaration and the death furnishes no rule for the admission or rejection of the evidence. It may serve as one of the exponents of the belief of the deceased that his dissolution was or was not pending.

Where the party said, "I am afraid, Doctor, I shall never recover," and the surgeon said, "You are in great danger," and the party replied, "I fear I am," his declarations were admitted.    Wharton on Crim. Ev. sec. 285 ; *Rex* v. *Craven,* 1 Lew. C. C. 77 ; *Rex* v. *Simpson,* id. 78.

That the deceased did not die immediately is not material. If the deceased believed he was dying, the admissibility of his declaration is not affected by the fact that his medical attendant had hope.    So declarations made while the declarant believed he would die, were held admissible, thongh he lived eleven

days afterward, and his medical attendant did not think the
case hopeless, and continued to tell him so.    Wharton on
Crim. Ev. sec. 283; *Rex* v. *Mosly*, 1 Mood. C. C. 97; *Rex* v.
*Peel*, 2 F. & F. 21; *State* v. *Tilghman*, 11 Ired. 513; *Johnson*
v. *State*, 17 Ala. 618; *State* v. *Nash*, 7 Iowa, 381.

Mr. I. A. BUCKINGHAM, and Mr. EDWARD P. VAIL, also for
the People.

Mr. JUSTICE WILKIN delivered the opinion of the Court:

At the September term, 1887, of the Macon circuit court,
plaintiff in error was indicted for the murder of one William
Gross.    On a trial at the next term he was found guilty, the
jury fixing his punishment at death.    Motion for a new trial
and in arrest of judgment being overruled, he was sentenced
to be executed on the 30th day of March last.    At the Ottawa
term of this court, begun in the last named month, a writ of
error was ordered, and the same made a *supersedeas*, and the
record now comes before us for final review.

Deceased resided in the village of Blue Mound, where he
and Charles Gross, his brother, kept a dram-shop.    There
had been no intimate acquaintance between the prisoner and
either of the brothers, nor was there any unfriendly feeling
between them.    On the 27th of June, 1887, the prisoner wrote
a letter to Charles, in which he stated that he had seen him
sell liquor to a minor, and threatening him with prosecution
unless he was paid $25.    This letter was received by Charles
on the 29th of June, and handed to deceased the same day.
On the first day of July the defendant went to Blue Mound,
and while there that afternoon, inquired of the post-master if
"Gross Bros." had sent him a letter at Stonington.    He at
the same time stated that he had seen the Grosses sell liquor
to a minor, and said: "If they don't give me $25, I'll fix them."
To another witness: "If they don't give me $25, I'll give it
away, or do them up."    To a third party: "He was going to

have $25, and if he did not get it he would cut their hearts out;" and to still another witness: "I want $25, and if the. Grosses don't pay me I will cut the guts out of them." Unnatural and unreasonable as these threats of personal violence seem, the witnesses who testify to them are uncontradicted, and for the purposes of our opinion they must be accepted as proved. Charles Gross met him that evening, and asked him if he wrote the letter above mentioned, and he answered he did. No angry words passed between them at that time. The prisoner remaining in the village that night, stated to one or more parties early the next morning, "that he had caught the Gross Bros. selling liquor to a minor, and unless they made it right, he was going to give them up." The people of the village were, at this time, in a state of excitement, growing out of prosecutions, pending and previously tried, against saloon keepers for illegal sales of intoxicating liquors.

On the morning of the 2d of July, between nine and ten o'clock, defendant was standing by the side of a locomotive which had just stopped at a street crossing in the village. No one was near him, and he seemed to be looking at or examining the engine. Deceased, passing along the sidewalk, approached the locomotive from the opposite side, and as he crossed the railroad track in front of the engine, seemed to discover the defendant, and immediately turned and went to where he was standing. Almost immediately they were seen striking at each other, and were very soon both down, struggling with and striking each other. Just before they separated, Gross was on top of and striking the defendant about the head. None of the witnesses heard anything said between them. They were seen by different persons,—some from the beginning of the fight, by others after the first blow was struck, and still others not until they were down. These persons were in different directions from them, and all more or less distant. Some of them could see plainly, while the view of others was more or less obstructed. That their testimony should be

conflicting, is not to be wondered at.   No definite conclusion can be reached, from their statements, as to who struck first, or at what time in the struggle the stabbing was done.   Deceased got up, leaving the defendant lying on the ground, and walked about one hundred feet to the porch of a building occupied by one Schwab as a saloon, and there showed a wound in his left side, saying, Westbrook, the defendant, had stabbed him.   On the trial, the prosecution proved that immediately after the affray the prisoner stated to one party that if he cut Gross he did not know it.   To another he said, "The son of a bitch hit me, and then I cut him."   On the preliminary trial he said Gross cursed him and knocked him down, and that he must have fallen on the knife.

The conduct of defendant in writing the threatening letter to Charles Gross, and in making threats against him and deceased, was reprehensible in the extreme, and his contradictory statements as to how the cutting was done, though doubtless made under excitement, can not be reconciled with honesty of purpose; and yet, from the evidence of all the witnesses, it is clearly shown that the encounter in which the mortal blow was struck was not of his seeking, but brought on by the deceased.   The evidence all shows that he left the sidewalk and approached the defendant, who was unconscious of his presence, and we think the weight of the proof is, that the deceased struck the first blow.   At least, it must be conceded that, most strongly construed against the defendant, the testimony of all the witnesses who saw the affray would leave in the mind a reasonable doubt as to whether or not the fatal stroke was made with malice aforethought, or in a sudden heat of passion, caused by an assault made upon him by the deceased, thus reducing the crime to manslaughter.   Or, if it could be maintained, on the testimony of these witnesses, together with the previous threats and subsequent contradictory statements proved, that the killing was murder, still it could scarcely be contended that the crime is so clearly proved, and

so manifestly wanting in mitigation, as to justify the infliction of the death penalty.

The prosecution, however, proved, over defendant's objection, a statement made by deceased on the afternoon of the day of the stabbing, which the court below held competent as a dying declaration. That statement, as sworn to by Dr. Harvey, one of the attending physicians, is as follows : "He said he did not know Westbrook. He was very slightly acquainted with him. He saw this man standing down by the railroad ; thought it was Westbrook ; walked down to him ; asked if he was the man that wrote this letter to him ; that Westbrook turned around and struck him with a knife—had the knife in his hand ; he struck Westbrook with his hand ; found he was wounded ; got up and started for the saloon." The effect of this statement was to prove a most cruel and unprovoked assault, and no doubt went far to secure defendant's conviction and the infliction of the extreme penalty of the law, hence its competency becomes a question of the first importance.

The preliminary proof submitted to the judge, as a basis for its introduction, consisted of the testimony of witnesses who described the wound, and its immediate effect, and the statements of Dr. Harvey as to what he told the deceased about the wound, and its probable effect. Several medical witnesses describe the injury, and they agree, substantially, in their statements. They say the wound was a vertical cut, two inches long and about three inches deep, penetrating the lower lobe of the left lung, three-quarters of an inch below the apex of the heart. A rib was severed, and a small artery cut. The most satisfactory evidence as to the immediate effect of the injury, is that of Dr. Harvey, who says he saw him shortly after he reached the porch at Schwab's ; that he found him bleeding profusely, and the blood, being mixed with air from the wounded lung, was of a frothy appearance ; that his breathing was labored and painful ; that as he breathed, the air passing through the wound "made a whistling noise."

This witness further testified, that he caused deceased to be removed to a back room in Schwab's house, and there dressed the wound; that he succeeded in staunching the bleeding and closing the wound. While there, he told deceased that he had a very serious and dangerous wound,—that the chances were against his recovery, and he might not live an hour. He advised him to make a statement and put it in writing, and told him he had better send for his wife. To all these statements and advice Gross made no reply whatever. He told other parties present that he would like to have his wife sent for. Soon after the wound was dressed, which was about ten o'clock A. M., he was taken to his own house. An attorney and notary public were brought in, and near twelve o'clock M. the attorney prepared and propounded to him certain interrogatories in writing, to which he also wrote down the answers. This paper was signed and sworn to by him before the notary. It was lost or destroyed, and the court below refused to allow proof of its contents. It was based on the same preliminary proof as the oral statement, which was admitted. We think the court below ruled properly in excluding it as proof on behalf of the People, and in the view we take of the competency of the oral declaration, it is unnecessary to consider the question of its competency as rebuttal on behalf of defendant.

It is impossible to tell, from the evidence of Dr. Harvey, just when the statement sworn to by him was made, except that he says it was in the afternoon of the day of the stabbing. In fact, as we understand his testimony, it was made at different times,—"in broken conversations," as he says. He also testifies that after the wound was dressed, at Schwab's, and before either the oral or written statement was made, he had administered brandy, and deceased had slightly revived from the shock, though his condition was not materially changed. He further testified, that while he regarded the wound as very dangerous, it was not necessarily mortal, and in this he is corroborated by all the medical witnesses who saw the deceased

before death, and who attended the post mortem. The question being whether or not the deceased believed he was about to die, at the time he made the statement in question, Dr. Harvey gave it as his opinion that he did so believe, but he gives no facts upon which he predicated his conclusion, and no weight could properly be given to that evidence. The question of Gross' belief as to impending death was for the court, to be determined from facts proved, and not by the mere opinions of witnesses. In *Starkey* v. *The People*, 17 Ill. 21, SKINNER, Judge, says: "It is for the court in the first instance to determine upon the admissibility of the declarations, upon proof of the condition of the mind of the deceased at the time they were made; and if the proof does not satisfy the court, beyond reasonable doubt, that they were made in *extremity*, and that they are dying declarations within the law, they should not be permitted to go to the jury."

First, then, what are dying declarations, within the rules of law; and secondly, do the facts proved bring the declaration under consideration within those rules.

In *Starkey* v. *The People, supra*, it is said: "Dying declarations are such as are made by the party, relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance, and in the absence of all hope of avoidance,—when he has despaired of life, and looks to death as inevitable and at hand." (See, also, *Tracy* v. *The People*, 97 Ill. 101; *Digby* v. *The People*, 113 id. 123.) "They are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone,—when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth." 1 Greenleaf on Evidence, sec. 156; 1 Wharton on Crim. Law, sec. 668.

Does the evidence produced in this case satisfy the mind that when William Gross made the statement admitted in evi-

dence, he entertained *a fixed belief and moral conviction that his death was impending, and certain to follow almost immediately?* Had he then no hope of recovery? Had he, at that time, despaired of life, and did he look to death as inevitable and at hand? Unless these questions can be answered affirmatively, the declaration was not a dying declaration, and should not have been allowed to go to the jury.

That one making a statement of this kind was in extremity, may be proved either by language used or acts performed, and it may be inferred from the evident danger of the party, or from statements made to him by medical or other attendants; but by some mode of proof it must affirmatively appear that all hope of recovery was gone. Here, we have neither, words nor acts of the deceased indicative of his state of mind when he made the statement. He said nothing,—he did nothing. He expressed no desire to have provision made for his family. He exhibited no anxiety as to his spiritual condition, or preparation for death. The brother with whom he was in partnership was present, and it is passing strange, if he in fact believed he was about to die, that he said nothing to him of their business affairs. The only plausible theory upon which it can be claimed that deceased believed his death was impending when he made the statement, is, that the character of his wound was so appalling,—his danger so evident,—that when considered in connection with what he was told by Dr. Harvey, he must inevitably have reached that conclusion. This view was ably and ingeniously urged by counsel, in the oral argument; but, in our opinion, it is not tenable. The wound was not necessarily fatal. It had been dressed, and was not, at that time, particularly alarming in its appearance or effect. The statements of Dr. Harvey were, no doubt, calculated to alarm him, but they also contained expressions upon which to base a hope. "The chances were against him,"—but that left him to hope in the chance or chances in his favor. "His wound was very dangerous,"—but that statement implied

(which was true,) that his physician did not regard his case hopeless. He had been told, in the forenoon, that he might not live an hour; but he had survived several hours, and was at least apparently in no worse condition than when that statement was made to him. The disposition of the human mind is to cling to life, and hope, even in the presence òf death, that it may be averted. The evidence in this case, considered in all its phases, fails to convince us that the deceased had abandoned that hope when he made the declaration in question. We must therefore hold that it was improperly admitted in evidence, and for that error reverse the judgment of the circuit court.

To the introduction of the letter written by the defendant to Charles Gross, a general objection was made and overruled, and it is insisted that this was error. We think differently. While it was not addressed to the deceased, it is clear, from the uncontradicted statements of defendant, that it was intended for him as well as Charles. In view of these same statements it was relevant and competent. As to the objection that it was not shown that defendant wrote it, it is sufficient to say that it was clearly shown that he admitted it, to Charles Gross. There is no pretense that there was more than one letter of that kind. Besides, a general objection was not sufficient to raise this question.

Other questions are raised on the record, but as there is no reason to suppose they will arise on a second trial, no good purpose would be served by extending this opinion in deciding them.

For the error indicated, the judgment is reversed, and the cause remanded.

*Judgment reversed.*