## Ray Brom

*v.*

## The People of the State of Illinois.

*Opinion filed June 23, 1905.*

1. Criminal law—*proof of misconduct unconnected with the charges is not admissible.* In a murder trial, proof that the accused, just before his affray with the deceased, had had another fight with another person, about which fight the deceased had no knowledge whatever, is not admissible.

2. Same—*what necessary to render statement admissible as a dying declaration.* To render a statement admissible as a dying declaration, the person making it must have been under the fixed belief and moral conviction that his death was impending and certain to follow almost immediately.

3. Same—*when statement is not admissible as a dying declaration.* A written statement made some days before the injured man's death from blood poisoning occasioned by a comparatively slight wound, at which time he did not believe he was going to die, is not admissible as a dying declaration although signed by the deceased only a few hours before his death, where the evidence is not satisfactory that the deceased, when he signed the statement, believed he was going to die. (*Murphy* v. *People,* 37 Ill. 447, *Scott* v. *People,* 63 id. 508, and *Hagenow* v. *People,* 188 id. 545, distinguished.)

4. Same—*what not satisfactory proof that declarant believed his death was impending.* Proof that the declarant, when informed by his physicians that they "thought" there was no hope for him, remarked, "I guess its me to the other world," is not satisfactory evidence that he fully believed his death to be certain and imminent.

Writ of Error to the Circuit Court of Macon county; the Hon. William C. Johns, Judge, presiding.

The plaintiff in error, Ray Brom, at the October term, 1904, of the Macon county circuit court was convicted of the murder of Richard Roberts and sentenced to the penitentiary at Chester for a period of forty years, and a writ of error has been sued out to bring the record into this court for review.

It appears that the plaintiff in error, at the time of the killing, was a young man of about twenty years of age; that prior to the 20th of April of the year in which he was convicted he had been employed as a waiter at the lunch counter in a restaurant known as the "Railroad Young Men's Christian Association Restaurant," carried on by his brother at Decatur, in said county; that on that day he was discharged and another young man by the name of Richard Cavins was employed in his place; that on the afternoon of the next day he entered the room in the said restaurant where the lunch counter was located, in a somewhat intoxicated condition, and sat down upon a stool at the lunch counter near where Richard Roberts, who was in the employ of the Wabash Railroad Company as a locomotive fireman, was eating a lunch, · and laid his head on the counter upon his arms; that Roberts was dissatisfied with the food that was served to him, and in a rough and profane manner made complaint thereof; that Brom said to him, if he did not like the fare, or words to that effect, he better go somewhere else for his meals; that thereupon the men commenced to quarrel and were about to fight, when one Eugene Burson, an employee at the restaurant, ordered them to desist and sat down upon a stool at the counter between them; that Roberts continued to find fault with the food, whereupon Brom struck past Burson and hit Roberts with his fist upon the head. Brom and Roberts then clinched and commenced to fight. Roberts got his arm around Brom's neck and struck him several times with his fist in the face, causing his nose to bleed, cutting his lip, blacking his eye and otherwise injuring him. Brom cried "Quit!" but the fight continued in spite of the efforts of Burson to separate them. During the struggle Brom stabbed Roberts in the abdomen twice with the blade of a small pocket knife, inflicting upon him two wounds, from one of which he died upon the fifth day after receiving the injury. Prior to said difficulty Brom and Roberts had had no trouble.

LeForgee & Vail, for plaintiff in error:

It is well settled that to render dying declarations admissible in evidence as dying declarations they must have been made when the declarant was *in extremis* or at the point of death. *Barnett* v. *People,* 54 Ill. 325.

The declarations must have been made when the declarant was not only *in extremis* or at the point of death, but also had abandoned all hope of living and was in fear of dying. *Starkey* v. *People,* 17 Ill. 23; *Collins* v. *People,* 194 id. 506; *Simons* v. *People,* 150 id. 66; *North* v. *People* 139 id. 81; *Westbrook* v. *People,* 126 id. 81.

The declarant should not only be shown to appreciate the fatal nature of his injuries, but that his declaration was uttered under the sense and the solemnity of impending dissolution. *People* v. *Simpson,* 48 Mich. 474; 4 Cyc. of Ev. 930.

A dying declaration should not be received unless the proof clearly shows that the decedent was, at the time of making it, fully conscious of the fact that he was *in extremis,* not as a matter of surmise, conjecture or apprehension, but as a fixed and inevitable fact. *Westbrook* v. *People,* 126 Ill. 81; *Bolin* v. *State,* 9 Lea, 516; *Smith* v. *State,* 9 Humph. 9.

Nor is it sufficient that the declarant was in despair of ultimate recovery, because that is consistent with the hope of indefinite continuance of life. *Edmondson* v. *State,* 41 Tex. 496; *United States* v. *Schneider,* 21 D. C. 381.

W. H. Stead, Attorney General, and W. E. Redmon, State's Attorney, for the People:

If the defendant sought and brought on a difficulty with the deceased at the time of the killing, he will not be allowed to avail of the right of self-defense in order to shield himself from the consequences of the killing, however imminent the danger in which he may have found himself in the progress of the affray which he brought upon himself. *Gainey* v. *People,* 97 Ill. 270; *Henry* v. *People,* 198 id. 180; *Adams* v. *People,* 47 id. 379; *Kinney* v. *People,* 108 id. 519.

A statement is properly admitted as a dying declaration where, at the time it was made and signed, the deceased had been informed by his physician that he could not possibly live, and also realized that such was the case, and so informed others. *Hagenow* v. *People,* 188 Ill. 545; *Scott* v. *People,* 63 id. 508; *Murphy* v. *People,* 37 id. 447.

Mr. JUSTICE HAND delivered the opinion of the court:

It is first contended that the court erred in admitting proof of an affray between Brom and a young man by the name of Kirby Merrit, which occurred in the kitchen of said restaurant a few minutes before Brom entered the lunch room and before the fight took place between Brom and Roberts, and at a time when neither Brom nor Roberts knew the other was in the building. Oscar N. Bedford, who was in the kitchen, was permitted to testify, over the objection of the plaintiff in error, that Brom and Burson came into the kitchen a few minutes before the difficulty occurred between Brom and Roberts in the lunch room; that Brom was intoxicated; that the witness was cooking and Merrit was washing dishes; that without provocation Brom struck and knocked Merrit down, and when asked why he did it, said, "I don't know." We are unable to see what the difficulty between Brom and Merrit had to do with the homicide or upon what ground the admission of such testimony can be justified. While it was proper to show that Brom was intoxicated at the time of the fight with Roberts, to prove that he had had trouble with Merrit at a time and place other than where the difficulty took place between Brom and Roberts could throw no light on the affray between them, and may have tended strongly to prejudice the jury against the plaintiff in error and thereby work a serious injury to him upon his trial upon the indictment against him for the murder of Roberts. It has been repeatedly held in this court, and it is the rule in all courts where the common law prevails, that

where a party is upon trial upon a criminal charge, proof of his misconduct not connected with the charge upon which he is being tried should not be admitted, as such evidence is likely to prejudice the jury against the defendant and cause them to lose sight of the issues which they have been sworn to try. The authorities upon that question will be found collated and reviewed in *Addison* v. *People*, 193 Ill. 405.

It is next contended that the court erred in admitting in evidence a certain statement in writing signed by Richard Roberts as to what took place between him and Brom in the lunch room at the time he was stabbed by Brom, as the dying declaration of Roberts. It appears from the evidence heard by the court preliminary to admitting said statement in evidence, that after Roberts was wounded he was taken to a room in the building where the restaurant was located, where his wounds were washed and a portion of a sheet was tied around his body, when he returned to the lunch room and completed his meal. He then went to a physician's office where his wounds were dressed and afterwards was conveyed to a hospital in the city, where an operation was performed to ascertain definitely the extent of his injuries. It was found in one instance the knife struck a rib, and the injury from that wound was not serious, but in the other, that the knife had penetrated the cavity of the body but that none of the internal organs were injured. During the night after the operation, which was performed during the evening of the day upon which the fight took place, the State's attorney of said county called at the hospital and stated to an attendant that if Roberts' condition became serious and he was likely to die he would like to be called, as he desired to obtain from him a statement as to the cause of his injuries. On the night of the 25th of April the State's attorney was notified by telephone to come to the hospital, as Roberts' condition was such that he was likely to die. The State's attorney went immediately to the hospital and took Roberts' statement. He inquired of him if he thought he was likely to

recover, and he said he thought he would. The State's attorney said to the attendant he would leave the statement, and if Roberts became convinced he was about to die, to then read the same to him and have him sign it. The next morning, which was on the 26th, the State's attorney saw the physician in charge at the hospital and made substantially the same statement to him, and directed him to add to the statement, before it was signed, a clause to the effect that Roberts thought he was about to die. About ten o'clock on that day the physician, in company with another physician, went into the room where Roberts was, and said to him they "thought there was no hope for him," to which he replied, "I guess it's me to the other world." Nothing further was said or done with reference to the statement until the afternoon of that day, when the physician asked Roberts if he desired to sign the statement. He said he did. The physician then added to the statement the words, "I make the above statement believing that I am going to die and that there is no hope for my recovery," as he had been directed to do by the State's attorney, and read the statement over to Roberts and asked him if it was true. He said it was. He then asked him if he desired to sign it, and he said he did, and it was signed by him. Roberts, at the time he signed the statement, was in a weak condition and died that evening about 5:50 o'clock from blood poisoning, resulting from the knife wound which penetrated the wall of the abdomen, but at the time the statement was signed it does not, from anything that was said or done, appear that Roberts then considered his condition appalling. He had lived five days after he was injured. The night before the statement was signed he thought he would recover, and it is not shown that his condition had materially changed in the time intervening between the writing and the signing of the statement.

The admission of the dying declaration of the deceased in a homicide case forms an exception or qualification to the well settled rule that secondary or hearsay evidence is not

admissible. The reasons usually given in the books for the admission of such declarations are, first, that the solemnity of the occasion under which they are made dispenses with the necessity of an oath; and secondly, the impossibility, in many cases, of producing better proof of the homicide makes it necessary that such declarations be admitted in order that those clearly guilty may not escape punishment. Such declarations are made not under oath. There is no opportunity given to cross-examine the party making the same, and the accused is deprived of the right to meet his accuser before the court and jury face to face, and the courts, for those reasons, are not disposed to extend the rule to embrace cases which do not clearly fall within all its limitations. In the early case of *Marshall* v. *Chicago and Great Eastern Railway Co.* 48 Ill. 475, Mr. Justice BREESE, in discussing the admissibility of a dying declaration in a civil case, on page 477, said: "The exception is in derogation of common right, for, independent of constitutions and laws, an accused person has the right to have the witness who is to condemn him, in his presence, so that he may be subjected to the most rigid inquisition. To hang a man on the statements of one who is on his dying bed, racked with pain, incapable, in most cases, of giving a full and accurate account of the transaction, weakened in body and in mind, and, though in *articulo mortis,* harboring some vindictive feeling against him who has brought him to that condition, is, to say the least, and has always been, a dangerous innovation upon settled principles of evidence, and no court ought to be disposed to extend it to embrace cases to which it did not, in its inception, apply."

The cases in which said declarations are admitted have been confined by the courts to cases where the declarations were made by the injured party under the fixed belief and moral conviction that his death was impending and certain to follow almost immediately. In *Starkey* v. *People,* 17 Ill. 17, on page 21, the court said: "Dying declarations are, therefore, such as are made by the party, relating to the facts

of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance; when he has despaired of life and looks to death as inevitable and at hand." It was also said in that case, on page 20: "The accused, under the rule, has not the benefit of 'meeting the witness against him face to face,'—a constitutional right in all criminal trials with this solitary exception. He is deprived of the security of an oath attended with consequences of temporal punishment for perjury. He is deprived of the great safeguard against misrepresentation and misapprehension—the power of cross-examination. The evidence is hearsay in its character; the statements are liable to be misunderstood and to be misrepeated upon the trial, and the evidence goes to the jury with surroundings tending to produce upon the mind emotions of deep sympathy for the deceased and of involuntary resentment against the accused. It is vain to attempt to disguise the infirmities and imperfections of the human mind and its susceptibility to false impressions under circumstances touching the heart and exciting the sympathies, and the law has wisely, in case of dying declarations, required all the guaranties of truth the nature of the case admits of. The principle upon which such declarations are admitted is, that they are made in a condition so solemn and awful as to exclude the supposition that the party making them could have been influenced by malice, revenge or any conceivable motive to misrepresent, and when every inducement, emotion and motive is to speak the truth. In other words, in view of *impending* death and under the sanctions of a moral sense of certain and just retribution."

Mr. Greenleaf, in his work on Evidence, (sec. 156,) says: "A fourth exception to the rule rejecting hearsay evidence is allowed in the case of dying declarations. The general principle on which this species of evidence is admitted was stated by Lord Chief Baron Eyre to be this: that they are declara-

tions made in extremity, when the party is at the point of death and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice."

The question therefore arises here, does the evidence produced before the court in this case satisfy the mind that when Richard Roberts made the statement admitted in evidence he entertained a fixed belief and moral conviction that his death was impending and certain to follow almost immediately? Had he at that time despaired of life and did he look to death as inevitable? (*Westbrook* v. *People,* 126 Ill. 81.) It is clear from the evidence at the time he made the statement and the same was reduced to writing he entertained no such belief. He then stated he expected to recover. Dr. Fitzpatrick testified (and he was the only witness who testified as to what took place at the time the statement was signed) that "when the statement was made, or, rather, when it was written, Roberts didn't think he was going to die. Mr. Redmon [the State's attorney] left it there after eleven o'clock at night and asked me to have Roberts sign it when he realized he would not get well. Dr. Parish and myself went in the room of the deceased man and told Roberts we thought there was no hope for him and that the statement without his signature was of no use. We told him to think it over, and if he concluded or realized that he was not going to get well we would ask him to sign it. In the afternoon, about two or three o'clock, I took the statement to him and asked him if he wanted to sign it. First I asked him if it was all right, and asked him if he wanted to sign it. He said, 'It's all right,' and I asked him if he wanted to sign it. He said, 'Yes; I want my name on there,' and then I wrote on the bottom of the statement a clause which Mr. Redmon told me to put there," and Roberts then signed it. This is a full and con-

nected statement made by the doctor of what took place prior
to and at the time the statement was signed, and nothing
appears therein which shows that Roberts had made up his
mind that he would die almost immediately, at the time he
signed the statement.     The statement had no force as evi-
dence at the time it was written.     If it ever had any force as
such, it was because it was ratified by Roberts after he enter-
tained a fixed belief and moral conviction that his death was
impending and certain to follow almost immediately.     From
reading the testimony of Dr. Fitzpatrick we are impressed
with the view that Roberts did not so ratify the statement,
but that he signed the same by reason of the fact that he was
importuned so to do.     He was told by the physicians they
thought there was no hope for him and that the statement
without his signature was of no use; to think it over, and if
he concluded or realized that he was not going to get well
they would ask him to sign it; and the statement was after-
wards taken to him and he was asked if he wanted to sign it,
whereupon he said he wanted his name there.     Roberts was
not asked, at the time he signed the statement, if he desired
to then make a statement as to the manner in which he had
received his injury, but if he desired to sign the statement
which had been written out several hours before, and which,
at the time it was prepared, would not have been competent
evidence had it then been signed.     Other portions of the tes-
timony of Dr. Fitzpatrick tend to show that Roberts said he
thought he was going to die, before he signed the statement.
These statements of the doctor appear to be rather his con-
clusions as to what Roberts thought than what Roberts actu-
ally said, and he stated no fact or circumstance which showed
that Roberts had a fixed opinion that he was about to die
when he signed the statement; but taking the testimony
literally, as it fell from the doctor's lips, it does not appear
therefrom that Roberts ever said he thought he was then
about to die.     He may have been excited from what the doc-
tors told him, and may have thought, from his condition,

that he would not get well and that he might eventually die
from the effects of his wounds. That, however, was not
sufficient to make the declaration admissible. He must have
entertained, at the time he signed the declaration, a fixed be-
lief and moral conviction that his death was then impending
and certain to follow almost immediately. The question of
the belief of Roberts that his death was impending and cer-
tain to follow almost immediately cannot alone be deter-
mined from what the doctor testified he said upon that
subject upon the occasion of signing the instrument, but his
acts are to be considered in connection with his words, as
well as the circumstances which surrounded him at the time
the declaration was signed, in determining what his belief
relative to his immediate death was at that time. During the
night of the 25th Roberts said he expected to recover. The
next day he was told by his physicians they thought there was
no hope for him. They did not say to him there was no hope
for him, but they *thought* "there was no hope for him." In
reply thereto he said, "I guess it's me to the other world."
He did not say, "It's me to the other world," but "I *guess* it's
me to the other world." From the language then used it ap-
pears neither the doctors nor Roberts had given up all hope.
Roberts did not at that time, or at the time he signed the
declaration, ask for his friends or exhibit any anxiety as to
his spiritual condition or make any preparation for death,
but apparently remained in the same mental condition in
which he was before his physicians informed him that they
thought there was no hope for him, and when he was asked
if he wished to sign the statement he signed it without mak-
ing any declaration which showed that he thought he was
then about to die. The words written at the bottom of the
statement by the doctor were the doctor's words and were
not Roberts' words, but were placed there by the direction of
the State's attorney. While we do not hold that Roberts
could not have ratified the statement prepared the previous
evening by the State's attorney so as to have made it his

dying declaration, the evidence that he did ratify it after he was impressed with impending death should be of such a character as to satisfy the mind of such ratification beyond any reasonable doubt. We are not so satisfied from a consideration of this record, and are of the opinion the court erred in admitting in evidence said statement.

The question of the admissibility of dying declarations has often been considered by this court. Among the cases in this State upon that subject are *Starkey* v. *People, supra, Murphy* v. *People,* 37 Ill. 447, *Scott* v. *People,* 63 id. 508, *Westbrook* v. *People, supra, North* v. *People,* 139 Ill. 81, *Simons* v. *People,* 150 id. 66, *Hagenow* v. *People,* 188 id. 545, and *Collins* v. *People,* 194 id. 506, where will be found pretty much all the law upon the subject of dying declarations. The case of *Westbrook* v. *People, supra,* is upon its facts very similar to the case at bar. There the deceased was suffering from a wound inflicted with a knife. A physician was called shortly after the injury was sustained, who succeeded in staunching the blood and closing the wound. He said to the deceased that he had a very dangerous and serious wound,—that the chances were against his recovery and he might not live an hour. He advised him to make a statement and put the same in writing, and told him he better send for his wife. The deceased made no reply to these statements but requested that his wife be sent for. After his wounds were dressed he was taken home, and an attorney was sent for and his statement was reduced to writing. The statement was held not admissible. On page 90 the court said: "The wound was not necessarily fatal. It had been dressed, and was not at that time particularly alarming in its appearance or effect. The statements of Dr. Harvey were, no doubt, calculated to alarm him, but they also contained expressions upon which to base a hope. 'The chances were against him;' but that left him to hope in the chance or chances in his favor. 'His wound was very dangerous;' but that statement implied (which was true) that his physi-

cian did not regard his case hopeless. He had been told, in the forenoon, that he might not live an hour; but he had survived several hours and was at least apparently in no worse condition than when that statement was made to him. The disposition of the human mind is to cling to life, and hope, even in the presence of death, that it may be averted. The evidence in this case, considered in all its phases, fails to convince us that the deceased had abandoned that hope when he made the declaration in question. We must therefore hold that it was improperly admitted in evidence, and for that error reverse the judgment of the circuit court."

The defendant in error relies upon *Murphy* v. *People, supra, Scott* v. *People, supra,* and *Hagenow* v. *People, supra,* to sustain its contention. These cases differ materially from the case at bar. In the *Murphy case* the deceased died from a gunshot wound. When the physician called, his bowels were protruding from a ragged, lacerated wound through the walls of the abdomen. He inquired of the physician if there was any hope of his recovery and was informed there was none whatever. He died within four hours. Before the declaration was made he was visited by his spiritual adviser and partook of the last rites of the church. The declaration was held to have been properly admitted, but it was said the declaration was corroborated upon most of the material points by other evidence, and it was held there was abundance of evidence, independent of the declaration, to sustain the verdict. In the *Scott case* the deceased was informed by his physician that he was in a critical condition, and he had said to his pursuers that he was "killed" and was "dying," and he died within four or five hours after he was injured. The court held the declaration to be admissible. It was, however, said that the question of its admissibility was not objected to upon the trial, and that the evidence, independently of the dying declaration, fully and satisfactorily established the guilt of the defendant. In the *Hagenow case* the court say that at the time the deceased made and signed the statement,

not only had she been informed by the physicians that she could not possibly live, but she realized that such was the case and so informed those who came to visit her.

The parties have discussed other questions in the briefs filed, but as those questions will not arise on another trial, and from the view we take of the case, a consideration thereof has not been deemed necessary.

The judgment of the circuit court will be reversed and the cause remanded to that court for a new trial.

*Reversed and remanded.*