THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK CASSESSE *et al.* Plaintiffs in Error.

*Opinion filed October 25, 1911.*

1. CRIMINAL LAW—*a dying declaration is an exception to right of accused to face the witnesses against him.* A dying declaration is from necessity admissible in a prosecution for homicide to prove the fact of the killing, who was the murderer, and such other facts and circumstances as are immediately connected with the killing; but its admissibility is an exception to the right of the accused to have the witnesses against him testify in his presence, so that they may be cross-examined.

2. SAME—*dying declaration must be made under fixed belief in immediately pending death.* To be admissible as a dying declara-

tion the declaration must have been made under the fixed belief and moral conviction of the declarant that his death was impending and certain to follow almost immediately, without opportunity for repentance and without hope of avoidance.

3. SAME—*a mere belief by declarant that he may never recover is not sufficient.* A mere belief by the declarant that he may never recover from his injury is not sufficient to entitle his declaration to admission as a dying declaration, unless he further believes that his death is certain to follow in a very short time and has abandoned all hope of recovery.

4. SAME—*rule where death does not follow as soon as is expected.* If a dying declaration is made under the fixed belief of certain and almost immediate death and after all hope of recovery is abandoned by the declarant, the admissibility of the declaration as a dying declaration is not destroyed by the mere fact that the declarant, contrary to expectation, lived for more than a month.

5. SAME—*when a declaration is not admissible as a dying declaration.* A declaration is not admissible as a dying declaration where it is shown that the statement that the declarant, who was a foreigner, believed he was about to die and had no hope of recovery, was dictated by the police officer and was not the language of the declarant, who said he was feeling "pretty bad" and expected to die, and where it does not appear that the declarant, who lived for thirty-five days after making the declaration, was advised by any qualified person that his injury was fatal, or that he sent for a priest, although he was a Roman Catholic.

6. SAME—*fact that fatal shot was in the back is not conclusive evidence against the accused.* The fact that the fatal shot was received by the deceased in the back is not conclusive evidence that the accused is guilty of manslaughter, where the evidence tends to show that the deceased was the aggressor and fired several shots at the accused before the latter began to shoot, and that at the time the fatal shot was fired the accused and the deceased were running from each other, the deceased shooting sidewise as he ran.

7. The court reviews the evidence in this case, and holds that there is not that degree of proof which the law requires to remove all reasonable doubt of the guilt of the accused, and that the trial court erred in not granting a new trial.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

CHARLES E. ERBSTEIN, and BERNARD P. BARASA, for plaintiffs in error.

W. H. STEAD, Attorney General, JOHN E. W. WAY-
MAN, State's Attorney, and FRED H. HAND, (JOHN T.
FLEMING, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the
court:

This suit was begun by writ of error to the criminal
court of Cook county requiring the record of the conviction
of the plaintiffs in error, Frank Cassesse and Giuseppe Cas-
sesse, of the crime of manslaughter by killing Salvatore
Manno, to be certified to this court for review.

Manno was shot by Frank Cassesse with a revolver on
August 28, 1910, but did not die until October 6, 1910.
He made a written declaration at a hospital on Septem-
ber 1, 1910, which the court admitted in evidence against
the objection of the defendants. The evidence upon which
the statement was admitted consisted of the testimony of
two police officers, one of whom spoke and understood Ital-
ian. He went to the hospital and spoke to Manno, and
Manno said he was feeling pretty bad and expected to die.
The officer suggested making a statement, and told Manno
if he wanted to make one he would have an interpreter put
it in Italian. The other officer wrote the declaration and
talked to Manno through an interpreter. The officer asked
questions as to what occurred on the occasion and the in-
terpreter would put the questions to Manno and he would
answer. The officer testified that Manno was asked if he
thought he would get over the injury, and he said, "No, I
am going to die." The declaration began with a statement
that Manno believed he was about to die and had no hope
of recovery; but that was dictated by the police officer and
was a form used by the police and not the language of
Manno. There was no evidence that any surgeon or other
person qualified to give an opinion had told or advised
Manno that his injury would be fatal, and he was a Roman
Catholic but did not ask for the usual services of a priest

on such an occasion, and no priest was present.  The opinion expressed by Manno appears to have been based merely upon the fact that he felt pretty bad.  From the necessity of the case the dying declaration of the deceased is admissible in a prosecution for homicide to prove the fact of the killing, who was the murderer, and such other facts and circumstances as are immediately connected with the killing; but the admissibility of such a declaration is an exception to the right of an accused person to have the witness against him in his presence, so that he may be subjected to cross-examination and the usual tests of truth be applied to him.  The courts have given consideration and weight to that fact and have required all the guaranties of truth that the nature of the case admits.  It is a fair presumption that no person who has a fixed belief that his death is impending and certain and that he is going into the presence of his Maker will tell a deliberate falsehood.  A declaration made under such circumstances is admissible when the person making it is in actual danger of death and has given up all hope of recovery.  The rule is, that the declaration must be made under the fixed belief and moral conviction of the person making it that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as at hand.  (*Starkey* v. *People,* 17 Ill. 17.)  To make a declaration admissible the party making it must be under the belief that his dissolution is near at hand and without hope of recovery.  (*Barnett* v. *People,* 54 Ill. 325.)  The evidence must show that the declarant entertained a fixed belief and moral conviction that his death was impending, that he had no hope of recovery, and that he had despaired of life and looked upon death as inevitable and at hand.  (*Westbrook* v. *People,* 126 Ill. 81.)  The principle upon which dying declarations are admitted is, that they are made in a condition so solemn and awful as to preclude the supposition

that the party could have been influenced by malice, revenge or any conceivable motive to misrepresent and when every inducement was to speak the truth. It is not enough that he shall have thought he would never recover, but the declaration must be made under the belief of almost immediate dissolution. (*North* v. *People,* 139 Ill. 81.) These rules were recently declared, upon a full review of the decisions, in the case of *Brom* v. *People,* 216 Ill. 148. Statements that there must be a belief that death is at hand or immediate do not mean that the person making the declaration must be *in articulo mortis* or that death is impending at the very instant, but they do mean that it must be regarded as inevitable within a very short time. They mean that it is not sufficient for the person to believe that he will at some time in the future die from the effects of his injury, but that all hope of life has been abandoned and that death must follow soon. (*Rex* v. *Perry,* 2 K. B. 697; 17 Ann. Cas. 285.) It is immaterial if a fixed belief of that kind is not realized for some time, and if Manno made the declaration under the belief of impending death, when every hope of recovery was gone, it would be competent, although, contrary to his expectation, he lived thirty-five days afterward. The evidence, however, was not sufficient to satisfy the requirements of the law, and the court erred in admitting the declaration in evidence.

The defendants were together at the time of the shooting, and the father, Giuseppe Cassesse, shot and killed James Rinello at the same time that Frank Cassesse shot Salvatore Manno. There had been no trouble between the defendant Frank Cassesse and Manno or Rinello, but there had been bad feeling between the men who were killed and the defendant Giuseppe Cassesse. Concerning that trouble there was no dispute in the evidence. On August 15, 1910, Giuseppe Cassesse was playing an Italian game called "tocco" for wine in the restaurant of Calliendo with Manno and Rinello and another Italian named Zuccolo. In the

first game Manno was the winner and the wine was drunk.
Zuccolo was the winner of the second game. He was from
Calabria, and asked the others if they wanted to distribute
or invite any one in accordance with the Neapolitan style
or according to the Sicilian style. Giuseppe Cassesse said,
"I am not from Naples; I am from the province of Ca-
zera,—a province nearby Naples." Manno and Rinello got
up and became angry and Manno called Cassesse vile names.
Giuseppe tried to pacify them and said that they were from
his province. Manno and Rinello went out into the alley
and soon afterward came back and the trouble ceased for
that time. On August 21 Manno and Rinello came into the
pool room of Basillo and asked two other men, Colleta and
Tuchillo, for their revolvers. Colleta asked Manno why he
wanted the revolvers, and Manno said he must kill Giu-
seppe. He said he had trouble with Giuseppe. Rinello
made a similar statement to Tuchillo, but Colleta and Tu-
chillo refused to give them the revolvers. A witness who
was present when Manno and Rinello had some words with
Giuseppe testified that he saw them outside loading their
revolvers; that they came back and asked where Giuseppe
was and were told that he had gone to a saloon across the
street, and they said if he was not coming there they would
go and see him. On August 28, in the afternoon, Giuseppe
went to the pool room of Basillo, and Manno and Rinello
came in and abused him with vile epithets. Afterward,
about six o'clock, Rinello came back to the pool room and
said he was looking for trouble. Giuseppe asked Manno
to let him alone and let him live in peace. Giuseppe was
peaceful and attending to his own business, merely looking
at someone playing pool. Frank Cassesse was in the res-
taurant of one Spina at that time, playing cards, and was
told by friends to go to the pool room and take his father
away, for he was in danger. Frank went home and took
a revolver and went to the pool room and asked his father
to go home with him. They left the pool room, which was

on Jefferson street, and went to Polk street, and were going west on Polk street when the fatal affray occurred. The general reputation of Manno and Rinello for peace, good order and quiet was bad.

The evidence as to the fatal occurrence is as follows: It was about seven-thirty in the evening and quite dark. The defendants walked west on the north side of Polk street and crossed over to the south side. Salvatore Manno, James Rinello, Dominick Manno, (a brother of Salvatore Manno,) Giuseppe Aurelia, Victoria Emanuel, and another Italian who had left Chicago at the time of the trial, were walking east on the south side of Polk street. The defendants met this party near an alley and an affray occurred, in which Giuseppe Cassesse shot James Rinello and Frank Cassesse shot Salvatore Manno. Dominick Manno, brother of Salvatore Manno, testified that the defendants crossed Jefferson street and turned west on Polk street and met the other party; that his brother, Salvatore Manno, said "Good evening," and Giuseppe Cassesse drew a revolver and shot Rinello and Frank Cassesse shot Salvatore Manno; that twelve or thirteen shots were fired; that his brother, Salvatore Manno, and James Rinello did nothing and did not have any revolver or knife, and that the witness walked into the alley, which was two or three paces from the shooting, until the shooting was finished, when he came back. The defendants both testified that they met the party in which Manno and Rinello were; that it was quite dark and when they first saw the party they were close to them, and that Rinello and Manno drew revolvers. Giuseppe Cassesse testified that Rinello shot at him twice, after which he shot Rinello; that Rinello attempted to continue shooting, and he could hear the revolver click, but the shots did not go and Rinello went past him to Jefferson street. Frank Cassesse testified that Salvatore Manno shot three or four times at him and he then shot at Manno; that Manno, while shooting, ran away in the alley and shot sideways,

and that he ran away in the street and shot two or three times at Manno, the last one when Manno was about forty feet away. The fatal shot was in the back of Manno. As before stated, Dominick Manno testified that neither his brother nor Rinello had a revolver nor any other weapon, but Basillo testified that the next morning after the shooting Dominick Manno came to his pool room and asked where the door to the alley was; that he was told where it was, and he opened the door and stooped down and put a revolver in his pocket; that when asked how he knew there was a revolver there, Dominick replied that he went to the hospital to see his brother and he told him to see Rinello, and he told him that there was a' revolver in that place. The witness testified that he had seen the revolver before and had kept it for Rinello and Manno. Spina, the keeper of the restaurant where Frank Cassesse was when notified to take his father away from the pool room, testified that he saw Dominick Manno a day or two after the shooting, and Dominick said that he went to the hospital to see his brother and the brother said, "Go over to Basillo's place and get a gun;" that the witness asked Dominick to see the gun, and Dominick opened it and five shots had been fired. Dominick Manno testified that he did not go to the back door of the pool room and pick up a revolver, and that he did not say anything to Spina about a revolver nor show him one. The court called and examined as a witness Giuseppe Aurelia, one of the party present at the shooting. He testified that Rinello and Manno said they were going up to somebody's house to get him; that they both had guns; that he advised that it was wrong and Manno called him a coward; that he said he might be a coward but he was not crazy to go to some one's own house and shoot him; that when the two parties met some words were exchanged; that Manno and Rinello went to their pockets and drew out their revolvers. He testified that he stepped back in the alley; that Dominick Manno also ran away and

he heard the shots fired, but he did not know who it was because it was quite dark. He testified that there were some words exchanged and that he did not see the defendants draw revolvers. The court also called and examined Victoria Emanuel, one of the same party, who testified that it was dark at the time and when he heard a shot he ran away in the alley; that he did not know whether the men who were killed had revolvers or not; that he did not see the defendants, and that he did not know where the shots came from nor how many were fired, but heard several.

All the evidence admitted to the jury, including the dying declaration, which was of the same purport as the testimony of Dominick Manno, does not satisfy our minds, beyond a reasonable doubt, of the guilt of the defendants, after giving due weight and consideration to the fact that the jury saw and heard the witnesses. Considering the competent testimony, the verdict was supported only by the fact that the fatal shot was in the back and the testimony of Dominick Manno, who was discredited by the testimony of disinterested witnesses. His testimony was not in harmony with the undisputed facts that Manno and Rinello had mistreated and insulted Giuseppe Cassesse and had made threats against his life, and that Giuseppe Cassesse was peaceable and inclined to avoid quarrel. The fact that the shot was in the back was not inconsistent with the testimony of Frank Cassesse that they were both running from each other and that Manno was shooting sideways as he ran. In our opinion there was not that degree of evidence which the law requires to remove all reasonable doubt of the guilt of the defendants, and the court erred in not granting a new trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*