THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HENRY VAN BROUGHTON, Defendant-Appellant.

First District (5th Division) No. 61550

Opinion filed January 23, 1976.

James Streicker and Brenda E. Richey, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Linda Ann Miller, and Eugene J. Rudnik, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

Defendant brings this appeal after a jury had convicted him of the murder of Mary Ann Combs. He contends that his conviction was based upon an improperly admitted dying declaration and the testimony of an incompetent seven-year-old child. Further, assuming the conviction was proper, he contends the sentence of 75 to 150 years was excessive.

The record discloses that on the morning of May 17, 1973, Ms. Combs was at home with Kennard Combs, her seven-year-old son, two of her other children, her friends Ellis and Jackie Walker, and defendant.[1] They were all temporarily sharing the same apartment. Kennard, a State's witness, testified that defendant came into his room that morning and took a roller from the window shade in his room. He then saw defendant beat his mother with the roller and some wires. This beating took place in his mother's bedroom as she lay naked upon the bed, and he saw bruises on her back, face and buttocks. After the beating, he saw his mother in the hallway and also observed Jackie Walker remove the sheets from his mother's bed and place them in a laundry bag.

Joanne Hudson, who lived in an adjoining apartment, testified that when she came home from school that day shortly after noon, she saw Ms. Combs in the hallway wearing only a trench coat and with cuts and bruises all over her body. Ms. Hudson brought Ms. Combs into her apartment and then called the police. Shortly thereafter, Ms. Hudson heard a knock on the door, looked through the peephole and saw defendant. She gave no response and he left.

Officer Mantia of the Chicago Police Department went to Ms. Hudson's apartment in response to her phone call. He testified that when he entered her apartment, he observed Ms. Combs lying on the couch with multiple lacerations and contusions on her body. He asked Ms. Combs the identity of her assailant, and she replied that it was her boyfriend, Henry Broughton (defendant). She also gave his address and stated that he had beaten her with a wire. After summoning a squadrol to take Ms. Combs to the hospital, and within two minutes after she had given him the information concerning defendant, Mantia attempted to help her up from the couch. When he did this, she began to moan and said, "I am in pain, I am dying, I can't" and then passed out. She was eventually taken to Provident Hospital where, upon regaining consciousness, she again told Mantia that Henry Broughton had beaten her. Thereafter, she was wheeled into the emergency room and died within a few hours.

In the afternoon of the day in question, Investigator Buehler went to Ms. Combs' apartment. There, he spoke with Kennard and observed some wires, a brown belt, and a shade roller in Ms. Combs' bedroom. He also noted that the bed did not have any sheets on it (these were later found in a laundry bag). Buehler called the crime lab for the purpose of determining whether the shade roller contained any suitable

---

[1] Decedent's mother characterized defendant as decedent's common-law husband. He was the father of two of her children.

fingerprints and he inventoried other items, including a broom handle which was found in the kitchen. In the bedroom he also found a number of papers addressed to defendant, one of which was a Western Union telegram used to accompany a money order which was dated May 4, 1973, and addressed to Henry Broughton at the Cook County Jail. Mail records at the jail indicated the money order (and presumably the telegram) were received by Broughton on May 6, 1973.

Officer Brown of the Chicago Police Crime Lab testified he went to deceased's apartment at the request of Investigator Buehler. He dusted a shade roller for fingerprints and found one sufficient for identification purposes. After comparing it to defendant's fingerprints, he stated that it was a print of defendant.

Ronald and Deatrice Broughton, defendant's brother and sister-in-law, testified for the defense. Ronald stated that he and Deatrice picked up defendant at about 8 p.m. on May 16, 1973, at the Cook County Jail and took him to their home, where he spent the night. On May 17 (Ms. Combs was beaten that morning) Ronald left his home with defendant at approximately noon and drove defendant to 53rd and State.[2]

Deatrice Broughton testified that she and Ronald picked up defendant at about 10:30 p.m. on May 16. She also stated that defendant slept at their house and left in the company of Ronald at about noon on May 17.

Ellis Walker, testifying for the defense, stated that at approximately 10 a.m. on May 17 three men—two masked and the third wielding a gun, entered Ms. Combs' apartment where he and his wife were living and asked for defendant. After Ms. Combs informed them that defendant was in jail, she was struck over the head with the gun and was taken into the bedroom where she was beaten by the two masked men with a broom, shade roller and cord. After about half an hour, the three men left and Walker used a sheet to cover Ms. Combs, who was lying naked on her bed. He then dozed off on the living room couch. When he awoke, he saw Ms. Combs leave. She said she was going for help, and shortly thereafter defendant arrived carrying a bag of groceries. Walker told him what had happened, and defendant went next door and knocked on the door. Receiving no response, he returned and talked to Walker. All this transpired in the front room, and Walker did not see defendant go near the decedent's bedroom.

Prior to his testimony, Kennard Combs, the seven-year-old son of Ms. Combs, was found to be competent to testify. After a preliminary hearing out of the jury's presence, the court also found that Ms. Combs'

---

[2] Ms. Combs' apartment was at 5266 South State Street.

statements to Officer Mantia naming defendant as her assailant came within the dying declarations exception to the hearsay rule. It is because of these rulings that defendant urges he is entitled to a new trial.

OPINION

■■ The law with respect to dying declaration has been firmly established in this State. In *People v. Tilley*, 406 Ill. 398, 403-04, 94 N.E.2d 328, the Illinois Supreme Court enunciated the following rule regarding such statements:

> "To make them admissible into evidence as dying declarations, and as an exception to the rule against hearsay evidence, it must appear that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand. [Citations.] * * * It is the state of mind of the deceased and not that of any other person, which determines admissibility. [Citations.] The declarant must be in possession of his mental faculties sufficiently to understand what he is doing and to be able to give a true and correct account of the facts to which the statement relates. [Citation.] * * * Courts will look to all the facts existing and surrounding the party giving the dying declaration at the time, before and after the declarations are made forming the *res gestae* and tending to show his true state of mind. [Citation.] Finally, the court, upon a preliminary hearing outside the presence of the jury, must first be convinced beyond all reasonable doubt that all the elements of a true dying declaration are present, before such statements may be heard and considered by the jury."

Likewise, in *People v. Beier*, 29 Ill.2d 511, 515, 194 N.E.2d 280, the court stated regarding dying declarations:

> "The rule is that such a declaration must be made under the fixed belief and moral conviction of the person making it that his death is impending and certain to follow almost immediately, without opportunity for repentence and in the absence of all hope of avoidance, when he has despaired of life and looks to death as at hand."

Thus, the central question is whether decedent believed she was dying when she made the statements and not whether she was actually close to death at that time. (*People v. Cassese*, 251 Ill. 422, 96 N.E. 274.) The declarant's belief may be determined by anything said and also by the

facts and circumstances surrounding the making of the statement. *West-brook v. People*, 126 Ill. 81, 18 N.E. 304.

■■ In Illinois, the standard for judicial review of the admission of dying declarations has been merely that of whether the record supports the trial court's factual determination. Thus, in *Tilley*, the court in holding that a dying declaration was properly admitted, stated at page 407:

> "The questions which go to the credibility of * * * witnesses, and the weight to be given their testimony, were matters for the court on the preliminary examination and later for the jurors when the witnesses testified before them. In such function this court will not substitute its judgment for that of the court or jury."

Previously, in *People v. Corder*, 306 Ill. 264, 276, 137 N.E. 845, the same conclusion had been reached in reviewing the trial court's admission of a dying declaration:

> "The trial court saw and heard the witnesses who testified with respect to the circumstances under which this statement was made and he applied correct rules of law, and we are not prepared to say that his conclusion from those facts was not correct. We hold, therefore, that the statement was properly admitted."

Similarly, in *People v. Smith*, 21 Ill.App.3d 366, 316 N.E.2d 170, the court refused to disturb the trial court's admission of a dying declaration citing the above language from *Tilley* and referring to 5 Wigmore on Evidence § 1442 (3d ed. 1940), which states:

> "The circumstances of each case will show whether the requisite consciousness [of approaching death] existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances."

■■ Here, the record indicates the trial court's awareness that it must be convinced beyond a reasonable doubt that all the elements of a dying declaration existed. Out of the jury's presence, the trial judge examined Officer Mantia who stated that when he arrived at Joanne Hudson's apartment he saw decedent lying on a couch with multiple lacerations and contusions about her face, neck, chest, stomach and upper thighs. In response to his question, she stated that her boyfriend Henry Broughton had beaten her with a wire. The officer called for a squadrol, and when he attempted to help her get up from the couch she stated, "I am in pain, I am in pain, I am dying." She then said, "I can't" and she fell back. This statement was made within two minutes after she had identified Henry Broughton as her assailant. Upon their arrival at the hospital and just prior to her entry into the emergency room, the officer

.again asked her who had caused her condition and she once more responded, "Henry Broughton."

An autopsy established she had suffered over 200 lashings with a wire and had been beaten about the head with a blunt object, causing "a broad, extensive hemorrhage underneath the skull." The trial court was of the opinion that Ms. Combs was dying when she told the officer that defendant was her assailant, and we cannot say this conclusion was incorrect. We hold, therefore, that the statements were properly admitted.

Defendant further contends that the court erred in permitting a seven-year-old child to testify. As a general rule, a child over fourteen years is presumed to be competent to testify. However, where the child is under fourteen, a competency hearing must be held before the child is permitted to testify. (*People v. Armstrong*, 127 Ill.App.2d 377, 262 N.E.2d 271.) It is not the age but the degree of intelligence which determines the competency of a child. (*People v. Brown*, 52 Ill.2d 94, 285 N.E.2d 1; *People v. Ballinger*, 36 Ill.2d 620, 225 N.E.2d 10, *cert. denied*, 388 U.S. 920, 18 L.Ed.2d 1366, 87 S.Ct. 2141.) The standard to be used in making this determination was set forth in *People ·v. Jackson*, 3 Ill.App.3d 303, 279 N.E.2d 8, which held that to be qualified to testify there must be a showing that a child is sufficiently mature to (1) receive correct impressions from his senses; (2) recollect these impressions; (3) understand questions and narrate answers intelligently; and (4) appreciate the moral duty to tell the truth. It is the duty of the trial judge to determine the competency of such a witness, and· it is only where there has been an abuse of discretion or a manifest misapprehension of some legal principle that that decision should be reversed. *Brown; Ballinger*.

■■ Here, the trial judge questioned the witness out of the presence of the jury. In this examination, Kennard was able to spell his name and state his age, the school he attended, and where and with whom he lived. He was able to differentiate a lie from the truth, stating that a lie was a "story"; whereas, the truth was "a real thing." A lie was "bad"; whereas, to tell the truth was "good." If he told a lie, Kennard said, the judge would "put me in an orphan home." He promised to tell the truth. Only following this examination did the court determine Kennard was competent to testify. We are of the opinion that the preliminary interrogation of the court satisfied its duty to ascertain Kennard's competency. Any subsequent confusion in his testimony before the jury relates not to competency but to his credibility.

■■ Finally, defendant contends his sentence of 75 to 150 years was

excessive in that the court did not consider his potential for rehabilitation. Our examination of the transcript of proceedings indicates that the trial judge considered defendant's potential for rehabilitation in the light of the seriousness of the offense. Based thereon, he imposed the sentence he felt was appropriate. It is comparable to sentences which have been upheld for other similar offenses. See, *e.g.*, *People v. Allen*, 56 Ill.2d 536, 309 N.E.2d 544, *cert. denied*, 419 U.S. 865, 42 L.Ed.2d 102, 95 S.Ct. 120 (100-200 years); *People v. Nicholls*, 4 Ill.2d 533, 256 N.E.2d 818 (100-150 years); *People v. Newbury*, 22 Ill.App.3d 1, 316 N.E.2d 559 (50-150 years).

The standard of review where the sentence imposed is within statutory limits is whether the trial court exercised proper discretion. (*People v. Garth*, 31 Ill.App.3d 716, 334 N.E.2d 359.) For us to modify it, the sentence must clearly depart from the spirit and requirement of the Illinois Constitution that the punishment imposed reflect both the nature of the offense and the possibilities of rehabilitation. (*People v. Hogue*, 1 Ill.App.3d 881, 275 N.E.2d 193.) From our review of the record, we believe the trial court did consider the nature of the offense as well as defendant's potential for rehabilitation and that there was no abuse of discretion in the imposition of the sentence here.

■■ As additional support of this conclusion, we note that defendant could be eligible for parole when he has served "20 years less time credit for good behavior" (Ill. Rev. Stat. 1973, ch. 38, par. 1003—3—3 (a)(1)), and under Administrative Regulation No. 813 of the Department of Corrections, Adult Division, good behavior might result in his becoming eligible within 11 years, 3 months.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

LORENZ, P. J., and BARRETT, J., concur.