(No. 14099.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. JOHN SAVANT, Plaintiff in Error.

*Opinion filed December 22, 1921—Rehearing denied Feb. 9, 1922.*

1. CRIMINAL LAW—*when admitting testimony as to statements by victim is not ground for reversal.* In a trial for murder, where it is not disputed that the defendant committed the homicide, the admission of testimony of witnesses who came upon the scene immediately after hearing the shooting that the wounded man said, "John shot me," and that when asked why, he replied, "I don't know," and "John said, 'you fooled me long enough,'" is not ground for reversal, even though the statements may not be competent as part of the *res gestæ.*

2. SAME—*what statement is admissible as a dying declaration.* In a murder trial a statement made by the wounded man, after he was taken to a hospital immediately following the shooting and just before he was taken to the operating room, that the defendant shot him four times without giving him "a chance to say anything" is admissible as a dying declaration, where it is proved that the declarant was under the firm belief and conviction that his death was imminent, and where he died during the operation or a few minutes afterward.

3. SAME—*defendant in murder trial should ask for instruction defining manslaughter.* It is not error in a murder trial for the court to fail to give an instruction defining manslaughter where no such instruction is asked for by either the prosecution or the defense, as the defendant may, if he prefers, have his case submitted so that the jury will be compelled to find him guilty of murder or not guilty.

4. SAME—*when judgment will not be reversed for permitting jury to take written dying declaration to jury room.* It is error for the court to allow the jury to take with them to their room a written statement by the deceased, which is in evidence as a dying declaration, but the error will not work reversal where several witnesses had testified to practically the same matter contained in the statement, it being clear that the defendant was not prejudiced by such action.

WRIT OF ERROR to the Circuit Court of Franklin county; the Hon. CHARLES H. MILLER, Judge, presiding.

GEORGE B. WHITE, G. A. HICKMAN, and CARL CHOIS-SER, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROY C. MARTIN, State's Attorney, and GEO. C. DIXON, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

John Savant, plaintiff in error, (hereafter called defendant,) was convicted in the circuit court of Franklin county of the murder of Fritz Heick and sentenced to be hanged. He has sued out this writ of error to review the judgment.

It is urged that the court erred in admitting testimony for the prosecution; in giving instructions for the People; in failing to give an instruction defining the crime of manslaughter; in allowing the written dying declaration of deceased to be taken by the jury when they retired to consider their verdict; and that the jury was guilty of misconduct prejudicial to defendant.

It is not denied that defendant shot and killed Fritz Heick on Sunday morning, January 2, 1921, but it was claimed by defendant on the trial of the case that the killing was done in self-defense. Defendant's brother, Albert Savant, is a merchant residing and doing business in the village of Valier, in Franklin county. He sold groceries and other merchandise. He owned the building he did business in, which faced the street on the south. The first floor was divided north and south into two rooms. The east room was occupied as a pool-room and the west room as a store. The west half of the second story of the building was divided into five or six rooms and was occupied by Albert and his family as their residence. The kitchen was the north room, next south of it was the sitting room, and then three bed-rooms. The east part of the second floor was a miner's hall. There was a passageway or hall between the living rooms and the miner's hall, with doors opening from it into the living rooms. The stairway leading to the living rooms was inside the rear of the building

and led up into the kitchen. There was a building used by Albert as a warehouse about thirty feet northwesterly from the store building. It was about eighteen feet square and faced south. The killing occurred in that building, no one being present at the time except defendant and deceased. Defendant had been for some time previous living with his brother, Albert. He was a miner, but at times worked for his brother in the store and pool-room. Deceased was a young man between twenty and twenty-one years old, and at and before the time of the homicide was working for Albert, delivering groceries and meat and otherwise assisting in the business. Defendant had a wife and two children living in Cincinnati. He was living separate and apart from his wife, because, as he claimed, of her misconduct with other men. He went to visit his wife and children the latter part of December, 1920. They became reconciled, and he brought her, their two children, and a child of his wife by a former marriage, to his brother's house, in Valier. The children were, respectively, nine, six and three years old. They left Cincinnati early in the morning of December 31 and arrived at Albert's house about nine o'clock that night. Albert's family had never met defendant's wife before. When they arrived at Albert's house there were present besides Albert, his wife, son and daughter, the deceased, Savant's maid, and Mr. and Mrs. LePere, friends of the Savants. After the parties were all introduced supper was prepared for defendant and his family. When defendant's family arrived, deceased, LePere, Freda Merchel, the maid, and Martha and Joe Savant, children of Albert, were playing cards on the kitchen table. When supper for the defendant's family was ready they went into the sitting room and continued playing cards. Defendant and his wife did not at any time play cards, and some time after eating supper retired to the south bed-room, which had previously been occupied by deceased and Albert's son, Joe. It had been arranged that deceased and Joe should sleep in a build-

ing called "the shack," which was seventy-five feet or more from the store building and had been occupied before that time by defendant. The card party lasted till the new year came in, and then deceased and Joe went to the shack and went to bed. The next day, which was Saturday, January 1, defendant and his family spent at the home of his brother Alfred, who also lived in the village of Valier, and returned to Albert's house some time that evening. Defendant and deceased were in the pool-hall until about 11:30 that night. Deceased was not ready to go to the shack when Joe, who was twelve years old, wanted to go to bed, and the boy went up-stairs and slept on a pallet. Defendant testified he and deceased left the pool-room together about 11:30 and went up-stairs, where deceased got the key to the shack so that he could get in and go to bed. He left the house immediately after getting the key. The next morning Albert and defendant were to go to the farm of one Dees to butcher a beef. After a late breakfast deceased was directed by Albert to hitch up the team and get some feed from the warehouse. While deceased was hitching up the team defendant went to him and asked for the key to the shack so that he could get a shaving set he had left there, as he wanted to shave. Deceased gave him the key and he procured the shaving set and went into his brother's house and shaved. After doing that he went down-stairs and out to the warehouse, where deceased was getting some feed, and there shot him, mortally wounding him, so that he died the same day. The gun used was a Colt automatic .38. After the shooting defendant went into his brother's house and to the bed-room occupied by him and his wife, where he remained until taken into custody.

Defendant testified on the trial, among other things, that he saw his wife "flirting with this boy" within twenty or thirty minutes after they arrived at his brother's house the evening of December 31; that some time during the day on Saturday he was trying to rent a house from a man

who lived in Christopher; that the deceased said he hoped
he would succeed in getting the house; that he was the
delivery boy for Albert to deliver goods and the house was
on his route and he would drop in every day. Defendant
testified he told deceased he did not want him to cause any
trouble,—that he had had enough trouble with his wife,—
and deceased laughed and went up-stairs. He further tes-
tified that when he went with deceased from the pool-hall
up-stairs Saturday night he read the newspaper a little while
before going to his bed-room; that when he went to his
bed-room his children were in bed and his wife had been,
and some of her clothes were there but she was not; that
he went down-stairs and back to the toilet but could not
find her; that he then remembered his sister-in-law had
spoken about a quilt deceased ought to have, and he took
it and went to the shack to give it to deceased and also to
see if his wife was there with him; that he heard voices
and asked deceased if he wanted a quilt; that deceased re-
plied he did not; that defendant then went back to his bed-
room but his wife was still not there; that he then went
back to the shack to listen, but hearing no voices came back
to his bed-room and his wife was there; that she said she
had been to the toilet. He testified he went to the warehouse
where he knew deceased was, on Sunday morning, to talk
to him about his relations with defendant's wife; that he
had told deceased before that he wanted him to stop joking
about his wife; that when he went to the warehouse de-
ceased was filling a bucket with feed, and defendant told
him he wanted to talk to him; that deceased asked what
he wanted, and he replied he had had enough trouble with
his wife and wanted deceased to leave her alone; that de-
ceased laughed at him, and when defendant told him he
meant it, deceased grabbed a hatchet and came toward him;
that defendant told him to stop, and deceased said he would
get him; that deceased was very angry and would not stop
but kept advancing toward defendant; that then defendant

drew his gun and began shooting; that he did not know how many shots he fired; that after the shooting he went up-stairs to his room in his brother's house.

The only corroboration of defendant's testimony of misconduct between his wife and deceased was the testimony of Mrs. Albert Savant that while defendant's wife was sitting in a rocking chair in the sitting room and deceased was playing cards in the same room with other parties the evening of December 31 she saw them nod at each other. The same witness testified she saw defendant leave the house just before the shooting and heard three or four shots, and immediately after the shooting she heard deceased crying and at once went to the warehouse; that deceased was lying on a sack of feed; that witness' husband was there also and one or two others; that deceased said, "John shot me," and the witness asked him what he shot him for; that deceased replied, "John said, you fooled me long enough;" that witness went back up-stairs to defendant's bed-room; that his wife was lying on the bed, crying; that witness said, "John, what for you done that?" and he said, "They kidded me long enough."

Charles LePere, who was one of the party at Albert Savant's house the night of the arrival of defendant and his family, testified that he was at Savant's store Sunday morning and started out to where deceased was; that before he reached there he heard from three to seven shots; that he saw Albert Savant, his wife and Dees go into the warehouse and he followed them; that Albert asked deceased what was the matter, and he said, "John shot me;" that when asked why he had done it he replied, "I don't know."

David Dees, who went to the warehouse immediately after hearing the shots, testified that deceased said, "John shot me," and he thought he said without any cause.

Deceased was taken from Valier to a hospital at Christopher, where he was operated on, and died during the operation or a few minutes afterward.

Albert Paga, a brother-in-law of deceased, testified he was at the hospital with him, and while they were making preparations for the operation he said to deceased, "Fritz, do you know what condition you are in?" and he replied, "Yes, sir;" that witness said, "Fritz, you got to die," and he said, "Yes, sir; I do know I got to die; I wish he killed me right away when he shot me; I got such awful pain;" that witness asked deceased to tell him the truth how it happened, and he said, "Albert Savant sent me for some feed, and I had got the feed bucket and went in for the feed and he followed me, and I turned around and he pulled his gun and said to me, 'You fooled me long enough,' and shot me three or four times, and I said, 'John, what I done to you?' and John never said anything and walked off." Witness further testified that when they started to the operating room with deceased one of the doctors said, "We are going to work for you, boy; we are going to try to help you."

John Shadowen, chief of police of Christopher, testified he saw deceased in the hospital before the operation and asked him how he was feeling; that deceased replied, "I feel awful bad; he has killed me;" that witness told him to brace up, maybe he would be all right, and deceased said, "No, he shot me four times; he killed me and did not give me a chance to say anything;" that he said John Savant shot him; that they had been good friends and never had any trouble; that they had no argument or words, and described how the shooting occurred in substantially the same language testified to by witness Paga. Shadowen wrote down the statement and had it typewritten. It was read over to deceased and signed by him and witnessed by Shadowen, Harry Owens and Albert Paga. The court admitted the statement as a dying declaration, which is as follows:

"I didn't have no trouble at all. I went in the warehouse to get some corn. He [John Savant] followed me in. He told me, 'You have fooled me long enough,' and

took out his gun and shot me four times and left. He did not give me a chance to say anything."

It is contended by counsel for defendant that the statements made by deceased in the warehouse immediately after the shooting were incompetent, and the testimony as to the dying declaration did not authorize the admission of the declaration in evidence. As to the statements of deceased in the warehouse immediately after the shooting, even if they were not competent as *res gestæ,* as contended, their admission in evidence, in view of the conceded fact that defendant did shoot deceased, would not warrant a reversal of the judgment.

It is argued by defendant that the declaration made by the deceased in the hospital at Christopher was not made under the firm belief and moral conviction that death was impending and certain to follow almost immediately, without opportunity for repentance. The proof does not warrant that contention. It shows deceased was under the firm belief and conviction that his death was imminent and he had no hope of escaping the impending danger. To our minds it meets all the requirements necessary to make the statement a dying declaration and competent testimony. *North* v. *People,* 139 Ill. 81; *Dunn* v. *People,* 172 id. 582.

There were axes and other tools in the warehouse where the shooting occurred, but no witness except Albert Savant, brother of defendant, testified to seeing any weapon near deceased when he was lying in the warehouse. Albert testified he saw a hatchet about fourteen or fifteen inches from deceased. Other witnesses who were in the warehouse immediately after the shooting testified they did not see a hatchet or any other instrument or weapon near him, and we are of opinion the jury were warranted to conclude from the evidence that the shooting was wholly unprovoked and unnecessary and was deliberate murder. The charge of alleged misconduct of deceased and defendant's wife is too flimsy and unreasonable to justify serious consideration as

any excuse for defendant's going to the warehouse, where deceased was, with a loaded automatic revolver to protest against his flirtations with defendant's wife.

Complaint is made of five instructions given on behalf of the People. Probably there are some slight inaccuracies in some of them, and some of them, perhaps, did not state all of the law on the question, but we are clear that there was not such error in them as to have prejudiced the rights of defendant or to require detailed discussion in this opinion. Twenty instructions were given on behalf of the People and twenty-nine on behalf of the defendant. Considered together they fairly state the law applicable to the theory of both the prosecution and defense, and defendant was not prejudiced by the giving of instructions.

No instruction was asked by either party or given by the court defining manslaughter, and it is contended this was error. The same contention was made in *People* v. *Lucas,* 244 Ill. 603, which was a murder case. This court said: "No such instructions having been asked by plaintiff in error, the court had a right to assume that plaintiff in error preferred to submit the case to the jury in such way that the jury would be compelled to find the defendants guilty of murder or not guilty. It was the right of plaintiff in error to submit that question to the jury and require the jury to pass on the question of his guilt or innocence of the crime of murder, and it was not the duty of the court to submit issues and questions to the jury which the parties by their action said they did not desire passed upon." The same, in principle, is *Dunn* v. *People,* 109 Ill. 635.

It is further contended the jury were guilty of such misconduct as that the judgment should be reversed. In support of the motion for a new trial defendant filed several affidavits, one by Ben Westbrook that he was the owner of the restaurant where the jurors took their meals during the trial, and while at their meals some of the time they were attended by only one officer; that they mingled with

other persons in the restaurant, and on some occasions when the officer had finished his meal he would go out and wait on the sidewalk for the jurors to finish their meals; that during the trial witnesses for the prosecution and the defense ate at his restaurant, and at different times he heard witnesses talking about the case. He made another affidavit that he never heard anyone talk to any juror about the case in his restaurant and never heard any talk about it in the presence of the jurors; that on two or three occasions the officer in charge, after he had eaten, stepped out on the sidewalk in front of the restaurant to wait for the jurors to finish their meals, but he was in view of the jury and not more than twenty-five feet from the farthest one. Other affidavits of misconduct were filed but were not of sufficient importance to require detailed discussion. The misconduct alleged was fully explained and shown to be without merit by counter-affidavits of all the jurors and persons not members of the jury. The court properly refused a new trial on that ground.

The court permitted the jury to take with them to the jury room, when they retired to consider their verdict, the written statement offered in evidence as the dying declaration of the deceased, and this it is claimed was error sufficient to reverse the judgment. A written dying declaration admitted in evidence in *Dunn* v. *People,* 172 Ill. 582, was allowed to be taken by the jury when they retired to consider their verdict. Parts of the written statement were held incompetent by the trial court, who placed brackets around the incompetent parts and orally instructed the jury not to consider those parts of the dying declaration. Permitting the statement to be taken by the jury was held to be erroneous under the circumstances presented in that case, but there were also other serious errors on the trial pointed out in the opinion of this court. In *Cooke* v. *People,* 231 Ill. 9, a bill of particulars filed by the People was read to the jury by the State's attorney and permitted to be taken

by them to their room when they retired to consider their verdict. This was held not to be reversible error. The court referred to *Dunn* v. *People, supra,* and said whether the dying declaration should be permitted to be taken by the jury rested largely in the sound discretion of the court, and said a judgment·would not be reversed for permitting the jury to take with them to their room a written instrument admitted in evidence unless it clearly appeared such action was prejudicial and ought not to have been permitted. The written declaration of deceased admitted in evidence in this case was competent in its entirety. It was very short, consisting of five lines as printed in the abstract. Oral testimony of witnesses before the jury as to the dying declaration was the same as the written statement. We are of opinion it was not within the sound discretion of the court to permit the written dying declaration to be taken by the jury to their room and that it should not have been permitted, but inasmuch as witnesses had testified orally to practically the same words of the dying declaration it seems clear that defendant was not prejudiced by it, and the judgment should not be reversed on account of that action of the court.

On account of the consequences to defendant we have given the record the best consideration we are capable of, and are firmly convinced that the jury were fully warranted in finding that the killing was murder, unattended by any mitigating circumstances, and the judgment is affirmed.

The clerk of this court is directed to enter judgment and an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of February 24, 1922, as the time when the original sentence of death entered in the circuit court of Franklin county shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of Franklin county.

*Judgment affirmed.*