(No. 14860.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN F. CORDER, Plaintiff in Error.

*Opinion filed December 19, 1922—Rehearing denied Feb. 8, 1923.*

1. CRIMINAL LAW—*indictment for felony must be construed according to Criminal Code.* As all felonies are defined by and required to be prosecuted under the Criminal Code and there is no such crime as a common law felony in Illinois, every indictment for a felony is required to be construed in accordance with the Criminal Code.

2. SAME—*when an indictment for murder is sufficient.* Omitting the formal parts of an indictment for murder committed by shooting, all that is necessary to make it sufficiently technical and correct is to say that on a certain day in a certain county the defendant did unlawfully, with malice aforethought, by shooting kill the victim of the crime; and it is not necessary to allege the exact date of the death, where it appears that the indictment was returned within a year and a day after the wound was inflicted.

3. SAME—*the indictment need not be indorsed in handwriting of foreman of grand jury.* It is not necessary that the names of the witnesses and the words "A true bill," indorsed on the indictment, be in the handwriting of the foreman of the grand jury.

4. SAME—*a substantial compliance with statute is sufficient in making up jury list.* A jury list will not be held void where there is a substantial compliance with the statute by the board of supervisors, and the court may refuse to quash the panel and sustain a challenge to the array where there is no showing that any substantial right of the defendant is impaired by a failure to comply strictly with the statute.

5. SAME—*when witnesses whose names are not indorsed on indictment may be permitted to testify.* Witnesses whose names were not indorsed on the indictment nor contained in a list furnished by the State when the indictment was presented may be permitted to testify, where the defendant was furnished with lists of their names several days before the trial.

6. SAME—*what constitutes a dying declaration.* A dying declaration is a declaration made by a party relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance.

7. SAME—*dying declaration need not be made immediately before death.* To constitute a dying declaration the statement must be made under the belief that death is due to follow immediately without hope of recovery, but the statement is competent even though, contrary to the declarant's expectation, he lives many days.

8. SAME—*competency of dying declaration must be determined by the court on preliminary proof.* Whether a statement made by a wounded person is a dying declaration must be determined by the court upon preliminary proof, and if the proof satisfies the court, beyond a reasonable doubt, that the declaration was made in extremity, and was, in fact, a dying declaration, it should be admitted in evidence.

9. SAME—*when statement made four days before death is admissible as a dying declaration.* In a prosecution for murder, a statement made by the victim of the homicide under circumstances showing a firm belief that she would never get well and after she had taken the last sacraments of her church is admissible as a dying declaration although she did not die until four days afterward, where the wound of which she died was of such a character that she must have known that her recovery was despaired of by her physician.

10. SAME—*when name of the deceased is sufficiently alleged in indictment for murder.* In a trial for murder the party killed must be proved to be the same person named in the indictment as the victim of the homicide, but it is sufficient to sustain an averment of a particular name that the person is usually or popularly known by that name.

11. SAME—*proof of motive is not necessary where deliberate criminal act is proved.* In a criminal prosecution the People are required to prove the commission of an act forbidden by law and to prove it beyond a reasonable doubt, but they are never required to prove the cause or reason that induced the accused to commit such act if without such proof the evidence is sufficient to show that a deliberate criminal act was committed.

12. SAME—*reasonable diligence to procure new evidence must be shown to warrant new trial.* A new trial will be granted on the ground of newly discovered evidence only when it is shown that it could not have been produced on the trial by the use of reasonable diligence, and such evidence must have a tendency to change the result.

WRIT OF ERROR to the Circuit Court of Vermilion county; the Hon. JOHN H. MARSHALL, Judge, presiding.

JONES & LEVIN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JOHN H. LEWMAN, State's Attorney, GEORGE C. DIXON, and I. RAY CARTER, for the People.

Mr. CHIEF JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, John F. Corder, was convicted in the circuit court of Vermilion county of murder and sentenced to imprisonment in the penitentiary for a period of forty years. He prosecutes this writ of error to reverse the judgment of conviction on the grounds that the indictment is insufficient; that the petit jury was not legally drawn; that the State was permitted to call witnesses not included in the list furnished him under a rule entered on arraignment; that the name of deceased was not proven as laid in the indictment; that the court improperly admitted a statement of deceased as a dying declaration; that the court erred in its rulings on the admission of evidence and giving of instructions; and that the evidence does not show the guilt of plaintiff in error beyond a reasonable doubt.

Plaintiff in error shot Jane Hardy, deceased, at her home in Danville, November 11, 1921, and she died at a local hospital six days later. Prior to that time he had for about six years been general yardmaster of the Big Four and New York Central lines at the Danville terminal. He was then forty years old, had a wife and a seventeen-year-old son living in Danville but was not living with them. Deceased was twenty-eight years old, had been married but was not living with her husband, and was then, and for four or five years had been, living with her sister, Margaret Marple. The Marples leased the house in which they lived from Thankmar Langner, who reserved for himself the front bedroom on the second floor. The house contained six rooms.

On the first floor were a living-room across the front or west end of the house, a dining-room immediately back of that, and a bed-room and kitchen immediately east of the dining-room, the kitchen occupying the northeast corner of the house. On the second floor were two bed-rooms and a bath, the front bed-room being over the living-room and the back bed-room being over the dining-room. The stairway rose along the east wall of the dining-room. The lower landing was in the northeast corner of the dining-room, and there was a doorway at that point leading into the kitchen. The main entrance to the kitchen from the dining-room was a passageway under the stairway, entering the southwest corner of the kitchen. In the southeast corner of the kitchen was the sink.

Plaintiff in error and deceased became acquainted about three and one-half years before November 11, 1921, and for the last two years he had been in her company practically every evening. During this time they had quarreled on more than one occasion, and about two months before he shot her plaintiff in error in anger said he was going to kill her, his wife and himself. On the evening in question Harry Snyder called to visit Mr. and Mrs. Marple. Marple, who was a railroad fireman, was not at home, but Mrs. Marple, Langner and deceased were there. The four of them began playing cards. About this time plaintiff in error called at the house to see deceased. He was invited to join them in the card game but replied that he preferred to read the evening paper. About eight o'clock Langner went up-stairs to bed. Plaintiff in error was again invited to join them in the card game but replied that he did not care to play cards. Mrs. Marple, Snyder and deceased continued the game for a while longer. After the game was over, Snyder went up-stairs to the bath-room, and Mrs. Marple's little daughter called to him to bring her some bread and butter. The women went to the kitchen to prepare the bread and butter, and Snyder came down and got it and

took it up to the child. Mrs. Marple went to the sink to wash some cups and saucers and deceased remained in the kitchen talking with her. Plaintiff in error came through the passageway into the kitchen, wearing his coat and hat. He asked deceased to come and tell him good-night. Up to this point, except as to minor and unimportant details, there is practically no conflict in the testimony.

There are four occurrence witnesses. Mrs. Marple testified that plaintiff in error walked into the kitchen, wearing his hat pulled down, and asked deceased to come and bid him good-night; that deceased was standing in front of the gas stove and he was standing in front of her; that deceased made some reply which she did not hear; that she started to the dining-room, and just as she came close to them he pulled a revolver from his right-hand overcoat pocket and shot deceased in the neck; that he turned the revolver on witness, and that deceased grabbed his hand and pulled it down so that the bullet hit the floor; that she and deceased rushed up-stairs; that near the top they met Snyder coming down; that he turned and went up-stairs with them, and that when he saw that deceased was shot he rushed down-stairs.

Snyder testified that he was up-stairs giving the child her bread and butter when he heard three shots fired; that he started down-stairs and met the women coming up; that he returned with them and saw that deceased had been shot; that he rushed down-stairs; that he looked for but could not find plaintiff in error; that he called a physician and assisted in getting deceased to the hospital.

In a statement made at the hospital, and which was admitted as a dying declaration, deceased said: "I was standing by the gas stove and Margaret was at the sink washing a couple of saucers. Corder said to me, 'Come on and go over to the Big Four with me for some sandwiches.' I said, 'No, Jack; I do not feel able to stand a beating to-night.' He said, 'Well, you gave him the bread, didn't you?' I said,

'Oh! you are always so jealous; that is the trouble with you.' He had his hat and overcoat on, and then he said, 'Come on in here and tell me good-night.' I said, 'No, you tell me good-night here; I am afraid to go there in the dark.' Then he pulled his right hand out of his overcoat pocket and he had a revolver in it. He pointed the revolver at me and fired. The bullet struck me in the neck. Then he pointed the gun at Margaret. I rushed over and struck the gun so that it pointed toward the floor. He fired and the bullet struck the floor. About this time Snyder came down-stairs and Corder pointed the gun toward the stairs and fired. All three of us, Margaret, Snyder and I, ran up-stairs and locked the door of the room."

Plaintiff in error testified that Snyder poured what appeared to be grape wine from a jug into a glass and then poured some white liquor from a bottle into it and persuaded him to drink it; that he drank it and then went to the kitchen to get a drink of water and a match with which to light a cigarette; that Snyder followed him and handed him another glass full of wine and asked him to drink it; that as he was drinking it deceased came down the stairway into the kitchen; that she said, "Oh, God! I didn't think you were going to drink anything!" that he said, "I did not intend to drink anything but Harry insisted, and I drank it to get rid of the glass;" that Mrs. Marple sliced some bread for her daughter and Snyder took the bread up-stairs; that in the meantime he walked back into the front room and sat down; that he felt a severe pain in his stomach; that he stood up, put on his overcoat and hat and went to the kitchen door and said to deceased, "Come, tell me good-night;" that she said, "You aren't going, are you?" that he said, "Yes, I don't feel good; I have had no supper;" that she said, "All right, then," and told him good-night but did not go to the door with him; that he left the house and did not return, and that no shooting occurred while he was there. Mrs. Marple and Snyder testified that no one drank

any intoxicating liquor in the house that night and that there was no liquor there. Langner testified that there was no liquor in the house; that he was asleep in the front bedroom at the time of the shooting and that he did not hear the reports.

The police officers arrested plaintiff in error at his room about midnight. He was then intoxicated and they found some moonshine liquor in his room. They searched his room for a gun but found none. He denied any knowledge of the shooting. They visited the house where the shooting occurred and found a 32-calibre leaden bullet on the floor near the sink and another bullet of the same character in the door leading from the kitchen to the stairway. The bullet that was removed from the neck of deceased at the autopsy was a 32-calibre leaden bullet. On the Monday preceding the shooting plaintiff in error borrowed a 32-calibre hammerless Iver-Johnson revolver from the night ticket agent at the Big Four station. This revolver has not been returned to the ticket agent and plaintiff in error claims that he left it in his desk at his office. He denies having it in the home of deceased on the evening of November 11. The revolver was not found.

Omitting the formal part, the first count of the indictment charges that plaintiff in error did "make an assault upon one Jane Hardy, then and there a human being then and there in the peace of the People, and a certain pistol which was then and there loaded with gunpowder and divers leaden balls, and by him, the said John F. Corder, had and held in his hands, he, the said John F. Corder, did then and there willfully, unlawfully, feloniously and of his malice aforethought shoot off and discharge at, against and upon the said Jane Hardy, thereby, and by thus then and there striking the said Jane Hardy with one of the leaden balls aforesaid, inflicted on and in the neck of the said Jane Hardy a certain mortal wound, of which said mortal wound she, the said Jane Hardy, from the eleventh day of Novem-

ber, in the year of our Lord one thousand nine hundred and twenty-one, until afterwards, to-wit, the seventeenth day of November, in the year of our Lord one thousand nine hundred and twenty-one, at and in the county of Vermilion, in the State of Illinois, did languish and languishing did live, on which said seventeenth day of November, in the year of our Lord one thousand nine hundred and twenty-one, the said Jane Hardy, in the said county of Vermilion and State of Illinois aforesaid, of said mortal wound then and there died."

It is contended that the indictment is uncertain because it does not specifically aver that the mortal wound from which deceased died was the mortal wound inflicted by plaintiff in error, and for the further reason that the date of the death is alleged under a *videlicet* and is therefore not a positive averment. There is no merit in either of these contentions. The indictment clearly avers that the mortal wound of which deceased died was the mortal wound inflicted by the bullet discharged from the gun held in the hand of plaintiff in error. The date alleged under the *videlicet* is not the date of the death of deceased but is the date to which deceased lingered. It is positively averred that the deceased died on the 17th day of November, 1921. There is much surplusage in this indictment, and it is because of all the unnecessary language used that the confusion, if any, occurs. Section 6 of division 11 of the Criminal Code provides that "every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statutes creating the offense, or so plainly that the nature of the offense may be easily understood by the jury." The statute creating the offense is section 140 of division 1 of the code, and the terms and language of the statute are: "Murder is the unlawful killing of a human being, in the peace of the People, with malice aforethought, either expressed or implied. The unlawful killing may be

perpetrated by poisoning, striking, starving, drowning, stabbing, shooting, or by any other of the various forms or means by which human nature may be overcome, and death thereby occasioned." There is no such crime as a common law felony in Illinois. All felonies in Illinois are defined by and required to be prosecuted under the Criminal Code, and every indictment for felony in Illinois is required to be construed in accordance with this code. (*People* v. *Connors,* 301 Ill. 112.) Omitting the formal parts of the indictment, all that was necessary to make it sufficiently technical and correct was to say that on a certain day in a certain county John F. Corder "did unlawfully, with malice aforethought, by shooting kill Jane Hardy." It is not necessary to allege the particular variety of fire-arm used to do the shooting, nor the particular variety of load in the fire-arm, nor the manner in which the fire-arm was held or discharged. Where, as in this case, it appears from the indictment that the indictment was returned within a year and a day after the cause of death was administered it is not necessary to allege the exact date of the death. All the other elements being proven, such an indictment would be sustained by proof of death resulting from the wound inflicted within a year and a day after its infliction. All of the unnecessary language in this indictment may be rejected as surplusage and there will remain sufficient language to meet the requirements of the Criminal Code. The jury and plaintiff in error plainly understood the nature of the offense with which plaintiff in error was charged, and he was in no way prejudiced by the surplus language used.

A further charge against the indictment is that the names of the witnesses and the words, "A true bill," were not indorsed on the indictment in the handwriting of the foreman. This was not necessary. *Bartley* v. *People,* 156 Ill. 234; *People* v. *St. Clair,* 244 id. 444.

A motion was made to quash the venire of petit jurors on the ground that the board of supervisors of Vermilion

county failed to make a jury list at its September, 1921, meeting, and that the list prepared at the September, 1920, meeting did not contain the names of ten per cent of the legal voters of each voting precinct in the county. The list from which the petit jurors selected to try this case was drawn was a list made at the September, 1920, meeting of the board of supervisors, which list contained the names of 2753 male voters of the county. Plaintiff in error states that in November, 1920, there were 18,361 male voters and 11,284 female voters in Vermilion county, making a total of 29,645 legal voters. It is argued that the board of supervisors in making up the list of names for petit jury service did not take into consideration the female voters, but it is clear from a comparison of the numbers hereinbefore given that this contention cannot be sustained. Ten per cent of the male voters would have been less than 1837, whereas the list contained 2753 names. Granting that the list does not contain the names of a full ten per cent of the total number of legal voters resident in the county in September, 1921, it contains very close to that number. It is also contended that there should have been chosen from each voting precinct a proportionate number of the names, and that the list contained the names of a number considerably in excess of ten per cent of the legal voters in some of the precincts while it contained the names of less than ten per cent of the legal voters in other precincts. While it is intended that the board of supervisors shall obey the statute in selecting the names to make up the jury list, the list will not be held void where there is a substantial compliance with the statute. Plaintiff in error does not contend that there were not a sufficient number of jurors in court, and it appears from the record that he did not exhaust his peremptory challenges. There is nothing whatever to show that any substantial right of plaintiff in error was impaired by the failure of the board of supervisors to comply strictly with

the statute in making up the jury list, and so the court did not err in refusing to quash the panel and sustain the challenge to the array. *Siebert* v. *People,* 143 Ill. 571.

When plaintiff in error was arraigned, March 15, 1922, he was furnished with a copy of the indictment and a list of the witnesses which appeared on the back of the indictment. At that time his counsel requested the court to require the State's attorney to furnish plaintiff in error with a complete list of the witnesses, and this the State's attorney agreed to do within two days. Thereafter, on the same day, the State furnished an additional list of witnesses. April 14 a further list of witnesses was given plaintiff in error, and a still further list was given him April 29. The case was called for trial May 2, and at that time plaintiff in error moved to quash the lists of witnesses furnished him subsequently to March 17, but this motion was overruled. When the witnesses whose names were not indorsed on the indictment or did not appear on the first list furnished were called objection was made to their testifying, but these objections were overruled. The action of the court in this regard was proper. *Logg* v. *People,* 92 Ill. 598; *Bolen* v. *People,* 184 id. 338; *Cross* v. *People,* 192 id. 291.

The principal point urged by plaintiff in error is the contention that the statement made by deceased at the hospital four days before she died should not have been admitted in evidence as a dying declaration. Deceased was shot in the neck shortly after nine o'clock Friday evening, November 11, 1921. The bullet entered the front of her neck, passed directly backward and slightly downward, and lodged in front of the fifth cervical vertebra. The bullet was lodged too deeply to be removed by an operation. Deceased was a member of the Catholic church, and on the morning following the shooting her priest came to the hospital and administered the sacrament of penance. Sunday morning he administered the sacrament of extreme unction and also the sacrament of the holy eucharist. These sacraments are ad-

ministered in cases of danger of death. Deceased had difficulty in breathing and it was necessary to keep her sitting up in bed. She had considerable temperature, which indicated that there was infection from the wound. She knew that the bullet was still in her neck and that it could not be removed. Her physician knew that she was in a serious condition but did not tell her that she was going to die. She died Thursday night, November 17, about eleven o'clock. The autopsy revealed pus around the bullet and a general breaking down of the tissues in the back of the neck. An assistant State's attorney visited deceased at the hospital on Sunday afternoon about two o'clock. She was restless and was breathing with difficulty. Mrs. Marple was there, and deceased called her to her bed and said, "Oh, Margaret! I am going to die. I will never be able to leave this room." The assistant State's attorney asked her if she desired to make a statement of the facts surrounding the shooting, and she replied that she did. The assistant State's attorney wrote the statement as she dictated it, read it over to her, and she signed it.

The law with respect to dying declarations is well settled in this State. It is not necessary that the deceased actually be at the point of death or that the statement be made at the time deceased is breathing his last. Dying declarations are such as are made by a party relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance; when he has despaired of life and looks to death as inevitable and at hand. (*Starkey* v. *People*, 17 Ill. 17; *People* v. *Buettner*, 233 id. 272.) While the wounded person must think that death is due to follow immediately and that there is no hope of recovery, it is immaterial if he is mistaken in this belief and death does not follow for some time. If the declaration is made under the belief of impending death,

when every hope of recovery is gone, it is competent, although contrary to his expectation he lives many days afterwards. (*People* v. *Cassesse,* 251 Ill. 422; *Kirkham* v. *People,* 170 id. 9.) Whether statements made by wounded persons are dying declarations must be determined by the court upon preliminary proof, and if the proof satisfies the court, beyond a reasonable doubt, that the declaration was made in extremity and was, in fact, a dying declaration, it should be admitted in evidence. (*People* v. *White,* 251 Ill. 67.) In passing on the objection to the admission of the statement of deceased as a dying declaration the trial court said that if the young woman believed that death was inevitable and close at hand and that she had no opportunity for repentance and had abandoned all hope of life, then her statement was admissible as a dying declaration under the established law; that the fact that she did not die until four days after she made the statement did not change the rule; that the young woman said that she would never be able to leave the room and that she was going to die, and that she did, as a matter of fact, die from the wound received; that she had taken the last sacraments of her church; that the bullet with which she was wounded was left in the back of her neck by the doctor because he did not consider it advisable to attempt to remove it; that her fever was rising and had reached 103 degrees,—these facts convinced him that the statement was made under such circumstances that it was properly admissible as a dying declaration. The trial court saw and heard the witnesses who testified with respect to the circumstances under which this statement was made and he applied correct rules of law, and we are not prepared to say that his conclusion from those facts was not correct. We hold, therefore, that the statement was properly admitted.

July 14, 1915, deceased was married to Leo Timmons. Some time thereafter he left her and did not return. She filed suit for divorce October 10, 1921, and a decree was

granted on the ground of desertion. Under this decree she was permitted to resume her maiden name. It is contended that this decree was void and that the true name of deceased was therefore Jane Timmons. Granting that this contention is true, she had been known in the community, where she resided for more than five years, by the name of Jane Hardy. It is sufficient to sustain an averment of a particular name that the person is usually or popularly known by that name. (*People* v. *Gray,* 251 Ill. 431; *People* v. *Decina, ante,* p. 260.) Undoubtedly, the party killed must be proved to be the same person named in the indictment, (*Bonardo* v. *People,* 182 Ill. 411,) and the proof in this case clearly meets that requirement.

Plaintiff in error complains that the court refused two instructions which told the jury that they were entitled to consider as a circumstance of his innocence the failure of the State to prove a motive for the commission of the crime charged. In a criminal prosecution the People are required to prove the commission of an act forbidden by law and to prove it beyond a reasonable doubt, but they are never required to prove the cause or reason that induced the accused to commit such act if without such proof the evidence is sufficient to show that the act was done by him. If the accused committed the act, the question whether he had a motive, or what it was, is immaterial. (*People* v. *Enright,* 256 Ill. 221.) A deliberate criminal act was established by the evidence of the People in this case, and it was therefore not necessary to prove a motive for the act. There was no error in refusing these instructions.

A motion for a new trial was made on the ground of newly discovered evidence. Three persons living across the street from the Marple home filed affidavits in support of the motion that they heard three gun reports from the direction of the Marple home after ten o'clock in the evening of November 11, 1921. It is contended by plaintiff in er-

ror that the evidence shows that he left the Marple home about nine o'clock and that he was not at that place at or near ten o'clock, and that if the shooting occurred after ten o'clock it was done by some person other than plaintiff in error. The rule is well established in this State that a new trial will be granted on the ground of newly discovered evidence only when it is shown it could not have been produced on the trial by the use of reasonable diligence, and if the evidence is cumulative in character it must be conclusive, necessarily leading to a change in the result. (*People v. Colvin*, 294 Ill. 196; *People v. Weisman*, 296 id. 156; *People v. Johnson*, 298 id. 52.) The motion for a new trial was properly overruled. More than five months intervened between the time of the shooting and the time of the trial, and it is clear that the exercise of reasonable diligence would have revealed this testimony so that it could have been produced on the trial. Furthermore, it is not at all conclusive in its nature and would not in any manner contradict the testimony of the People's witnesses that three shots were fired in the Marple home at nine o'clock.

It is further contended that the court erred in permitting the State's attorney to ask leading questions, in unduly restricting the cross-examination of some of the People's witnesses, in permitting the assistant State's attorney to testify on behalf of the People, and also that the rights of plaintiff in error were prejudiced by the conduct of the State's attorney. We have examined all these objections and find them to be without merit.

The record is free from reversible error, and the judgment is affirmed.