(No. 31473.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* R. U. TILLEY, Plaintiff in Error.

*Opinion filed September 21, 1950.*

D. Logan Giffin, and Alfred F. Newkirk, (James M. Winning, and William M. Giffin, of counsel,) all of Springfield, for plaintiff in error.

Ivan A. Elliott, Attorney General, and George P. Coutrakon, State's Attorney, both of Springfield, (Nelson O. Howarth, of Springfield, and Harry L. Pate, of Tuscola, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

Plaintiff in error, Ronald U. Tilley, to whom we shall refer as defendant, was found guilty by a jury in the circuit court of Sangamon County of murder by abortion and sentenced to a term of eighteen years in the penitentiary. He brings the cause here for review assigning countless errors in his trial, which did not occur until three and one-half years after the commission of the alleged crime.

The evidence shows that on July 20, 1946, Renee Stanley, an unmarried woman nineteen years old, died at St. John's Hospital in the city of Springfield as the result of an abortion. She had been confined to the hospital on July 17, 1946, by Dr. Franz K. Fleischli, her family physician, who considered her to be dying from the effects of peritonitis. A subsequent autopsy indicated that she had been pregnant and had expelled a foetus, and that a small wound or tear on the inner wall of the cervix had been the source of the fatal infection. At this time defendant was a licensed and practicing osteopath who maintained an office in two rooms of his residence at Springfield. In a statement made by the deceased on the evening before her death, she revealed to Dr. Fleischli and to Frank M. Pfeifer, an assistant State's Attorney who was present as the result of having received a complaint from the dying girl's father, that she had become pregnant and because she was unmarried felt that she had to do something about it; that on July 9, 1946, she had gone to the combined home and office of the defendant and asked him to perform an abortion; that defendant then used an instrument on her private parts, packed her with gauze or cotton and told her to go home. She related that nothing happened, so she returned to defendant's office a few days later; that the procedure was repeated, and the following day she became violently ill. In response to questions by Pfeifer she stated that she had paid defendant $200, and denied that she had made

any attempt to abort herself. Although this statement was not reduced to writing and signed, Pfeifer made notes of it which he later used while testifying. The foregoing statement of the deceased was also testified to by Dr. Fleischli, and was admitted into evidence by the trial court as a dying declaration.

For the defendant, his wife, Lula Tilley, who acted as his office receptionist, testified that a few days after July 3, 1946, a young woman who gave the name of Hazel Reynolds, but whom she later identified as Renee Stanley, came to the office and was admitted to see defendant for a period of thirty minutes. She stated that four or five days later the same young woman returned and asked to see defendant; that, while waiting to be admitted to the private office, the young woman, who appeared very pale and nervous, said: "I have missed my period and I have taken all kinds of medicine and I have even used a knitting needle. * * * I have used a knitting needle and I must have help." When defendant was free, the witness stated that she accompanied the young woman to his office, where the remarks about the medicine and knitting needle were repeated; that defendant looked at the girl; told her she was very sick and advised her to go to her family physician or to confide in her mother; that the doctor then assisted her through the reception room to the street where she got in a car and drove away. The witness professed to have remained with the young woman during the entire second visit and denied that defendant had then treated her.

Defendant, who stated that he was licensed in Illinois to perform osteopathic manipulation, but not to perform surgery or prescribe drugs, testified that he had seen a young woman whom he later learned was Renee Stanley, at his office in the early part of July, 1946; that at the time she complained of a pain in her back, for which he gave her an osteopathic treatment; that following the treatment he was asked to examine her female parts as she

thought there might be some trouble there; that he examined her, inserting a speculum to keep the vaginal area open, but could see nothing wrong and so informed the patient. He made a charge of $2 for the treatment. Defendant testified that he next saw the young woman four or five nights later when his wife brought her into his private office; that she was pale and crying, and said: "Doctor, I am in an awful lot of trouble. * * * I have taken everything—all kinds of medicine, and I went as far as using a knitting needle on myself and I want you to help me." He recounted that he advised her that she was very sick, to see her physician, and to confide in her mother; that he made no examination of her, made no charge for the visit, and assisted her to the street where she entered a car. The witness said that he next heard of her when he was arrested on the day of her death.

In rebuttal, Dr. Aloysius Vass, who performed the autopsy, testified that in his opinion it was not likely that the wound found on the cervix of the deceased had been caused by a knitting needle, stating that such a needle would cause a puncture wound rather than a tear such as he found. When cross-examined he admitted that knitting needles come in different sizes and that he had stated when previously examined that he did not know what sort of an instrument had been used to produce the wound he had described.

The principal contention of the defendant is that there is no competent evidence which in any manner connects him with the offense charged in the indictment, his position being that the alleged dying declaration of the deceased was not properly qualified, was mere hearsay, and as such not properly admitted into evidence. The admissibility of this declaration into evidence, its weight and credibility, must, despite our conclusion that a new trial is necessary, be determined in this opinion, for without it the People readily admit that there is insufficient evidence to support

a judgment of conviction against the defendant. The law with respect to dying declarations has been firmly established in this State. They are defined as statements of fact by the victim, concerning the cause and circumstances of a homicide, including homicide by abortion. To make them admissible into evidence as dying declarations, and as an exception to the rule against hearsay evidence, it must appear that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand. (*People* v. *Hubbs,* 401 Ill. 613; *People* v. *Savant,* 301 Ill. 225; *Starkey* v. *People,* 17 Ill. 17.) In *People* v. *Corder,* 306 Ill. 264, the fact that the declarant did not die until four days after making the statement, was held not to change the rule. It is the state of mind of the deceased and not that of any other person, which determines admissibility. (*People* v. *Maria,* 359 Ill. 231; *Brom* v. *People,* 216 Ill. 148.) The declarant must be in possession of his mental faculties sufficiently to understand what he is doing and to be able to give a true and correct account of the facts to which the statement relates. (*Tracy* v. *People,* 97 Ill. 101.) It is further well established that evidence that persons, whose dying declarations are offered into evidence, had received extreme unction or the last rites of their church is admissible to show the circumstances under which the declaration was made. (*People* v. *Kreutzer,* 354 Ill. 430; *People* v. *Buettner,* 233 Ill. 272; *People* v. *Corder,* 306 Ill. 264.) Courts will look to all the facts existing and surrounding the party giving the dying declaration at the time, before and after the declarations are made forming the *res gestae* and tending to show his true state of mind. (*Starkey* v. *People,* 17 Ill. 17.) Finally, the court, upon a preliminary hearing outside the presence of the jury, must first be convinced

beyond all reasonable doubt that all the elements of a true dying declaration are present, before such statements may be heard and considered by the jury. *People* v. *Maria,* 359 Ill. 231; *People* v. *White,* 251 Ill. 67.

In the foundation evidence in the record before us, the testimony of Sister Joel and Sister Berlindas of the hospital staff, and of Monsignor William J. Cassin, a clergyman, shows that on the evening of July 17, 1946, shortly after her admission to the hospital, Renee Stanley was given the final rites of her church, which rites are given only to a person in danger of death. It was shown that the deceased desired such rites; that during their performance she was fully aware of what was going on; and that at their conclusion she seemed grateful and relieved and thanked the priest. Sister Berlindas testified that after the rites the deceased had asked the nuns to pray for her. Defendant urges that this request indicates that the deceased had not despaired of life and abandoned all hope of recovery. Whether such request was for deceased's physical or spiritual well-being cannot be determined from the record before us, nor could the request, of itself, establish that the deceased believed she would survive. She was aware that she was given the rites reserved by her church for people who are in danger of death. We find nothing in the evidence relating to these rites, or to the later religious incidents, which shows that the deceased retained hope of recovery which would destroy the evidentiary value of such rites as a circumstance under which the declaration was made.

Dr. Fleischli testified that he had accompanied Pfeifer, the assistant State's Attorney, to the hospital on the afternoon of Friday, July 19, 1946, at Pfeifer's request, for the express purpose of telling Renee Stanley that she was dying and to enable Pfeifer to take what he considered a "death-bed statement" of what had preceded the girl's hospitalization. To that end the doctor stated that he in-

troduced Pfeifer to Renee, told his mission, and then said to the deceased: "You know that everything has been done for you, that you are—in spite of everything, are dying, and at the same time everything will be continued to be done for you." To which the girl either nodded her head or said "Yes, I know," which, in the opinion of the witness, made manifest that she knew she was dying. He further testified that although the deceased had a temperature of 105 degrees at the time and was dying, and had been dying since he had seen her at his office the preceding Wednesday evening, she was alert, lucid, and knew what she was saying. He stated that she had been treated with sulfa and oxygen, and was bright and alert, which was not unusual in a peritonitis case so treated. Except for the testimony relating to the medical treatment, Pfeifer's version of what was said, and of what occurred when the deceased's statement was given, was substantially in accord with that of Dr. Fleischli.

Defendant urges that the foregoing testimony does not show that the deceased was in sufficient possession of her mental faculties to understand what she was doing or to give a true and correct account of the facts relating to the defendant. We see little in the record to support such a contention, for both witnesses testified that the deceased was mentally alert and lucid. The testimony of Dr. Fleischli that a patient with high fever, who is being treated with sulfa and oxygen, remains mentally alert, is uncontradicted. Undoubtedly the deceased was under great emotional stress, and the fact that she could not remember the exact day of her second visit to defendant's office, does not, as defendant urges, destroy the credibility of the balance of her statement, which we find to be rational and cohesive.

The declaration of the deceased is next attacked on the ground that the evidence fails to show, beyond a reasonable doubt, that Renee Stanley had, in her own mind, abandoned all hope of recovery. The contention is that the evi-

dence shows the state of mind of the witnesses but not that of the deceased. It is true that a fixed belief in inevitable and imminent death must be entertained by the declarant. We have further held, however, that such a mental state may be induced by the statements of a physician or nurse; that it is not necessary that the approaching death be presaged by the personal feelings of the deceased. (*People* v. *Borella,* 312 Ill. 34.) We are of the opinion, from a consideration of all the circumstances surrounding the taking of the statement from Renee Stanley, notably the advice of her doctor, the fact that she received the final rites of her church, and her understanding of both, that such circumstances indicate that she viewed death as certain and impending when the statement was made. The fact that she did die seventeen hours later strongly supports such a conclusion.

The remaining argument advanced in regard to the dying declaration is more or less an assertion that the testimony of Dr. Fleischli and Pfeifer is not worthy of belief. The doctor admitted on cross-examination that at the coroner's inquest he testified that on the occasion of the taking of the declaration he had told the deceased "words to the effect of my telling her that her condition was very serious; we would do everything we could to help her, but she might not get well * * *." He stated he had not testified at the inquest that he had advised the deceased she was dying because the question was not asked him. The defense urges that this testimony gives rise to a belief that the doctor, in fact, did not tell Renee Stanley that she was dying. Such argument overlooks that, previous to the statement quoted above, the doctor testified at the inquest that his very purpose in accompanying Pfeifer to the hospital was to tell the deceased that she was dying. The fact remains also that the testimony given by the doctor at the trial was corroborated by Pfeifer. Defendant also holds forth the testimony of his witness Dragoo,

the coroner, as impeaching that of Dr. Fleischli. Dragoo testified that in a telephone conversation shortly after Renee Stanley's death, the doctor stated that he had told deceased that she might get well or might not get well. The doctor testified that he did not remember this telephone conversation. It was also brought out during Dr. Fleischli's examination that he, Pfeifer, and the State's Attorney who brought the cause to trial, engaged in four pre-trial conferences. The defense infers that it was not until then that it was decided that the doctor had told the deceased she was dying. When the doctor was rigidly cross-examined along this line, he was unshaken in his testimony that he had given the deceased such advice, and that the pre-trial conferences were merely to enable the State's Attorney to find out what was said, inasmuch as a great length of time had elapsed between the date of the declaration and the trial.

Pfeifer's testimony is attacked largely on the basis of his failure to take a written statement from the deceased and of his preference, as he stated it, "to rely on my memory." We know of no rule of law which requires a dying declaration to be reduced to writing, nor has any been cited. In addition, the defense's effort to minimize the testimony ignores the fact that Pfeifer took notes of his interview with the deceased and used such notes while testifying at the trial.

The questions which go to the credibility of these two witnesses, and the weight to be given their testimony, were matters for the court on the preliminary examination and later for the jurors when the witnesses testified before them. In such function this court will not substitute its judgment for that of the court or jury. (*People* v. *Potts,* 403 Ill. 398; *People* v. *DeMarios,* 401 Ill. 146; *People* v. *Simmons,* 399 Ill. 572; *People* v. *Buzan,* 351 Ill. 610.) We conclude that there was a sufficient foundation laid for the introduction of the dying declaration into evidence.

It is next insisted that even though the dying declaration was admissible in evidence, it does not sustain a verdict of murder because it is entitled to very little weight. In advancing this contention defendant relies on *Murphy* v. *People,* 37 Ill. 447, where a dying declaration was held not entitled to much weight because the deceased was under the influence of morphine and at times, while the declaration was being made, it became necessary to arouse him before the declaration could proceed. The *Murphy case,* on its facts, has no application to the instant case. Even though secondary evidence, the weight to be afforded a dying declaration is again a function of the jury. In the present case there was some corroboration of Renee Stanley's declaration, in that she was pregnant, it was shown that an abortion had been performed on her by an instrument, and the defendant himself corroborates that she visited his office twice early in July, 1946. We cannot say that there was insufficient satisfactory evidence from which a jury could reach a finding of guilty.

The next assignment of error we shall consider is the assertion that the court committed prejudicial error in admitting into evidence the preserved female parts of the deceased, and in allowing them to be exhibited to the jury by the pathologist, Dr. Vass. We previously held in *People* v. *Hobbs,* 297 Ill. 399, a murder-by-abortion case, that the preserved uterus of the decedent was properly admitted into evidence as a visual aid to the jury in following medical description and in understanding the nature and extent of the injury and determining how the offense was committed. In the instant case it was a vital question as to whether the wound which caused the abortion was one which could have been caused by a knitting needle or by some other instrument, and we deem the exhibit to have been properly admitted to assist the jury in its determination. It is true that Doctor Vass admitted that the preservative had caused the exhibit to become somewhat dis-

colored and shrunken and that he had removed two minute portions for miscroscopic examination, however, it is also true that he testified that the exhibit was substantially the same as it had been at the time of removal. Further, in viewing the exhibit we do not see that defendant was prejudiced by the fact that the exhibit contained all the female organs and rectum rather than the uterus alone, since all were related organs which were removed *en bloc*. Under the circumstances existing, the court did not err in admitting it into evidence or in allowing Dr. Vass's explanatory exhibition to the jury. In passing, we note that in the recent case of *People* v. *Singer,* 300 N.Y. 120, 89 N.E. 2d 710, it was held, without discussion of the point, that it was not error to allow exhibition before the jury of the mangled parts of the foetus and parts of the organs of the aborted woman.

Some consideration should also be given in this opinion to defendant's assignment of error that the court improperly admitted the testimony of Velma Miller and Albert Bergschneider as to alleged similar offenses committed by the defendant. It is not contested that evidence of prior similar offenses is competent to prove the criminal intent of one accused of performing an abortion, provided there is sufficient competent evidence to establish the act for which the accused is being tried. (*People* v. *Hagenow,* 236 Ill. 514; *People* v. *Hobbs,* 297 Ill. 399; *People* v. *Rongetti,* 338 Ill. 56.) The admission of such evidence is subject to the limitation that it may be considered by the jury only in determining the intent of the accused. To this end the scope of the testimony relating to the prior offense has been limited to a minimum, and it has been held to be prejudicial error to admit detailed testimony relating thereto, the most recent case of this nature being *People* v. *Stanko,* 402 Ill. 558. It is the defendant's contention that the elements of the prior offenses must be proved with the same degree of certainty and complete-

ness as the elements of the principal crime for which he is being tried. It is argued that since defendant's criminal intent must be proved beyond a reasonable doubt, the prior acts which establish such intent must also be proved beyond a reasonable doubt. In the *Hobbs case* it was stated that the criminal intent necessary to be established to convict a defendant charged with committing an abortion is the intent to commit a criminal abortion, that is, an abortion for a purpose other than to preserve the life of the mother. Thus the criminality does not arise from the fact that an abortion was committed, or from the means by which it was accomplished, but, rather, from the purpose for which it was performed. In the instant case, Velma Miller testified that in June, 1946, defendant made an examination of her, told her she was pregnant and that he would "rid her of the child" for $200. He then in fact treated her with instruments and accepted a fee. Bergschneider testified that in September, 1943, his wife aborted as a result of being treated by defendant and that the purpose of the abortion was that they "wanted no more children." In both instances the evidence is sufficient to establish that the acts of the defendant were not performed with an intent or purpose to preserve the life of the mother, thus making them criminal acts within the definition of the *Hobbs case*. Whether the witnesses were credible was again a question for the jury to determine. We find no merit in the contention that the trial court should have required a greater degree of proof of the prior offenses, and it properly denied defendant's motion to strike on this ground.

Further, on this point, defendant insists that the court had an affirmative duty to admonish or instruct the jury that its consideration of the testimony of Miller and Bergschneider should be limited to the question of defendant's intent. From the abstract we note that no objection was made to the testimony of either witness, thus giving

the court no opportunity to rule on its admissibility into evidence. Nor did the defendant offer an instruction setting forth the limitation of the evidence. No affirmative duty to admonish or instruct the jury attaches to the court because evidence of such nature is introduced, and the defendant having failed to invoke a ruling by objection, or by request for admonition or instruction, cannot now complain.

We now turn our attention to the alleged errors upon which defendant predicates his argument that he was denied a fair and impartial trial. It is argued that on three different occasions there were such irregularities in the handling of the jury as would warrant a new trial. We agree that two of the incidents are of grave consequence. It appears that on the second day of the trial, the court, on adjourning, placed the jury in the custody of four bailiffs who had been sworn to attend the jury. A deputy sheriff named DeFrates found accommodations for three of the men jurors at one hotel, and for four of the women jurors at another, a sworn bailiff being left with each group. Being unable to find hotel accommodations for the remaining five women jurors, DeFrates, of his own volition, placed them in the custody of one Mertrue Manning, a regular woman deputy sheriff, but who had not been sworn to attend the jury. The five jurors remained overnight at her home, where Mr. Manning, also a deputy sheriff, was present during the night. It appears that this group of jurors was driven to and from the Manning residence by still a third unsworn deputy.

When these events became known to the court and counsel the following morning, DeFrates and Mertrue Manning were examined by the court outside the presence of the jury. The former stated that the situation had presented an emergency and that he had no alternative other than to place the jurors in Mrs. Manning's custody. Mrs. Manning testified that while she was in charge no one had communicated or visited with any juror, personally

or by phone, not even her husband. In addition she stated that she had not discussed the case with them, nor had they read any newspapers. Following this the court denied the defendant's motion to withdraw a juror and declare a mistrial, for the reason that there was no evidence of any facts which could have prejudiced the defendant. Mertrue Manning was then sworn as a bailiff to attend the jury.

The second jury incident, which we will consider, occurred during the supper hour of the third day immediately after the jurors had heard the closing arguments but before they had been instructed by the court. While the jurors were eating in a public restaurant, one Gladys Farley made an attempt to converse with one of the jurors who was her sister-in-law. When the bailiff, Mrs. Manning, informed her that she could not converse with the jury, Farley, who was intoxicated, profanely referred to Mrs. Manning and her race, saying: "No —— —— can stop me from talking to my sister-in-law." When a male bailiff remonstrated with her she exclaimed: "I'm not afraid of your tin star," and later, "If I was on that jury I would free him." All of which remarks were made in the hearing and presence of the jurors, five of whom were of the same race as Mrs. Manning. None of them, however, conversed with Gladys Farley, whom the record shows was later cited for contempt and fined.

Defendant urges that both incidents, separately and when considered together, operated to his prejudice. With regard to the separation of the jurors on the second night the People invoke the familiar rule that a trial judge, even in a capital case, may, at his discretion, allow the jury to separate, or that a jury may be separated for housing purposes, and that in either case no error is committed unless it is shown that the separation operated to the prejudice of the accused. (*People* v. *Casino,* 295 Ill. 204; *People* v. *Wilson,* 400 Ill. 461.) As we view it, a different situa-

tion exists here. The judge in the instant case foresaw the separation of the male and female jurors and appointed bailiffs to attend them to insure the proper administration of justice as directed by section 15 of division XIII of the Criminal Code. (Ill. Rev. Stat. 1949, chap. 38, par. 745.) The further separation, which occurred without the trial court's knowledge, left a portion of the jury unattended by one who was sworn to the duties of a bailiff. The assumption of such duties by one who was without authority at law to act defeated the purpose for which bailiffs were appointed and denied to defendant the right that was afforded him by statute. This of itself, without further showing, may be said to have operated to the defendant's prejudice. In the case of *State* v. *Ungar,* 111 Atl. 37, we note that it was held error for the trial judge himself to place the jury in the care and custody of a detective who had not been sworn along with other constables to attend the jury. We do not depart from the rule of the *Casino case* as to separation of jurors, nor are we establishing a rule which may be invoked against every inadvertent straying of a juror, but are of the opinion that in those cases where jurors are rightfully separated because of sex or housing considerations, and bailiffs appointed to attend them, the proper administration of justice requires that they remain in the custody of authorized persons only.

As to the incident provoked by the untimely and ill-mannered remarks of a third person in the presence of the jury, the People urge that it could not in any manner have influenced the deliberations of any of the jurors. Fortunately there are but few reported cases where the remarks of a third person have been allowed to vitiate the finding of a jury. One such case is *People* v. *Kawoleski,* 313 Ill. 257, wherein the improper remarks were made in the presence of the jury by a bailiff who attended them. While not controlling on its facts, the reasons advanced for the result reached are suggestive in the case before us.

Whether defendant was in any way prejudiced by the conduct and remarks of Gladys Farley would be difficult to determine. It is an axiom of our legal system, however, that the solution of jury issues must be so safeguarded that the verdict may be confidently regarded as the product of the law and the evidence, uninfluenced by any extraneous pressure from any source whatever. We conclude that the incident must not be considered lightly in our consideration of whether defendant received a fair and impartial trial.

We think, too, that there is some merit to defendant's contention that prejudicial and incompetent matters were allowed to creep into the trial. On the occasion of conducting redirect examination of the People's witness Roy F. Stanley, the father of the deceased, the State's Attorney, by persistent questioning, elicited an answer that defendant was quite notorious in the city of Springfield. From the record we fail to see that the examination constituted proper redirect examination, or how the question asked had any tendency to prove the issue being tried. The same may be said of the State's Attorney's action of inquiring of the defendant whether he was known as a "ten-finger" man in California. The People argue that this question only sought to elicit information whether defendant, who had testified that he was licensed to practice osteopathy in California, was there limited to a practice of osteopathic manipulation with his hands. The only effect of the use of such a term, whether it be harmless slang or a vulgarity, would be to suggest to the jury that defendant's practice in California was not a reputable one, which fact had no bearing on the crime for which defendant was being tried.

The cumulative effect of the errors discussed is to leave an abiding conviction that defendant was not afforded the fair and impartial trial guaranteed him by law, to which he is entitled no matter how conclusive the evidence against him may appear. As pointed out in *People* v. *Stanko,* 402

Ill. 558, the rule that a judgment will not be reversed where the evidence clearly establishes the defendant's guilt does not justify the total disregard of the rights of a prisoner on trial for an alleged crime. Because the questions which go to the sufficiency and competency of the evidence will doubtless arise upon a new trial we have considered them at length in this opinion. The irreconcilable nature of the evidence introduced by the People and by the defense requires a jury singularly free from any outside influence to determine its weight and the credibility of the witnesses.

Numerous other errors assigned will not be discussed inasmuch as they may not again occur at a new trial, to which we feel defendant is entitled under the circumstances of the case.

The judgment of the circuit court of Sangamon County is therefore reversed and the cause remanded.

*Reversed and remanded.*